744 A.2d 47

**Clayton BROWN, a Minor, et al.**

v.

**Frank DERMER, et al.**

**No. 49, Sept. Term, 1998.**

Court of Appeals of Maryland.

Jan. 14, 2000.

346

Saul E. Kerpelman (Alan J. Mensh, Saul E. Kerpelman & Associates, on brief), Baltimore, for petitioner.

William C. Parker, Jr., Jennifer Silver Cavey, Parler & Wobber, L.L.P., on brief, Towson, for respondent.

Mauricio E. Barreiro, Gregory L. Lockwood, Kathleen F. Sullivan, Baltimore, on brief of the Property Owner Ass'n of Greater Baltimore, Inc. as Amicus Curiae.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW *, RAKER, WILNER, and CATHELL JJ.

BELL, Chief Judge.

This is a negligence action, instituted in the Circuit Court for Baltimore City on behalf of two children, alleging lead-based paint poisoning. The issue presented to this Court is the propriety of the trial court's grant of summary judgment in favor of the respondents, Frank and Harold Dermer, trading as HF & S Partnership (hereinafter "the Dermers" or "the respondents"). More particularly, we must determine whether allegations concerning a landlord's knowledge that leased premises contain flaking, loose or peeling paint, a violation of the Baltimore City Housing Code ("housing code"), are sufficient to survive summary judgment, where the landlord denies all general knowledge of the hazards of lead-based paint and poisoning or of its presence in the leased premises. The Court of Special Appeals affirmed the trial court's grant of summary judgment. *Brown v. Dermer*, 120 Md.App. 339, 345, 707 A.2d 407, 411 (1998). We disagree and, therefore, shall reverse.

## I.

The minor petitioners, Clayton and Crystal Brown, twins, born in January 1984, periodically [1] resided in a house, located at 4112 Hayward Avenue in Baltimore City and owned by the respondents. The house is a two story structure built in the early 1920's and purchased by the respondents in 1981. The petitioners' father, Christopher Brown, an existing tenant at the time of the purchase, then leased the house from the respondents.

---

\* Chasanow, J. now retired, participated in the hearing and conference of this case while an active member of this Court, but did not participate in the decision and adoption of this opinion.

1. Janet and Christopher Brown, the petitioners' parents, separated in 1983. The petitioners lived with their mother at another location; however, they spent weekends at the subject premises with their father.

The respondent, Frank Dermer is in business with his father, the respondent Harold Dermer. The respondents, under the name HF & S Partnership, purchased their first rental property in Baltimore City in 1968. Periodically thereafter, they invested in houses that needed restoration. The respondents also did electrical, plumbing, heating, carpentry and home improvement work for various landlords in Baltimore City.

In 1985, the petitioners were diagnosed with elevated blood-lead levels and lead poisoning. After receiving notice of the children's condition and conducting an investigation to ascertain the source of the lead poisoning, the Baltimore City Health Department (BCHD) issued a violation notice to the respondents, listing thirty (30) violations, including twelve emergency violations, regarding the presence of deteriorated lead paint at 4112 Hayward Avenue. The notice required the respondents to make certain corrections and repairs, within one week, or by January 23, 1986. The respondents did not complete the necessary repairs and corrections until April 10, 1986, more than two months later than ordered.

The Petitioners, by their mother and next friend, Janet Brown, thereafter filed suit against the respondents in the Circuit Court for Baltimore City seeking damages for lead paint poisoning, alleging their negligence.[2] Janet Brown's answers to interrogatories indicated that she informed the respondents of chipping, peeling and flaking paint in the house during 1983, one month before she became pregnant with the twins, but that respondents failed to correct the condition.

The respondents denied that they were notified of chipping, flaking and peeling paint. At his deposition, the respondent Frank Dermer admitted that, at the time of the

---

2. The petitioners's initial complaint was challenged by a motion to dismiss, which the respondents filed. That motion was granted; however, following a hearing on the petitioners' motion for reconsideration, the petitioners were granted leave to amend their complaint. The amended complaint, which the petitioners subsequently filed, contained four counts, all sounding in negligence. Following the filing of the respondents' answer, the parties engaged in discovery.

alleged lead poisoning, he was aware that Baltimore City laws and ordinances required rental properties be kept in habitable condition, that both Baltimore City ordinances and Maryland statutes banned the use of lead-based paint, and that the Baltimore City Code required the interior surfaces of rental buildings to be kept free of loose, flaking or peeling paint. In addition, he admitted that, at around the same time, he was receiving the *Evening Sun* newspaper, in addition to watching television and listening to radio news reports. Frank Dermer also testified at deposition that he periodically visited 4112 Hayward Avenue to do maintenance and conduct inspections. He recalled being inside 4112 Hayward Avenue approximately four to five months before the violation notice of January of 1986 was issued, but stated that he was unaware of any loose, flaking, or peeling paint anywhere in the premises.

The respondents moved for summary judgment,[3] arguing that, prior to the BCHD notice, they (1) had no knowledge of the hazard of lead-based paint, (2) were unaware that flaking and chipping paint in older houses could pose a danger to children, (3) had never before received a lead paint violation notice or had a lead paint suit filed against them, and (4) were unaware that the premises at 4112 Hayward Avenue contained lead paint in a deteriorated condition. The petitioners filed an opposition to the motion, contending that there was sufficient evidence from which the respondents' knowledge of the hazardous lead-based paint condition existing on the premises could be inferred. They also asserted that the Dermers could not, and should not be permitted to "close their eyes" to the issue of lead paint.

The trial court granted the respondents' summary judgment motion. It determined that there was no evidence from which a jury could infer that the respondents had knowledge of the

---

3. The respondents first filed a motion for summary judgment on October 9, 1996. That motion was answered by the petitioners, who, after deposing Frank Dermer, filed a supplemental response. The respondents subsequently withdrew that motion for summary judgment. They filed the motion that is the subject of this appeal on February 21, 1997.

presence of lead-based paint on the premises before they were served with notice of the BCHD notice. The petitioners noted an appeal to the Court of Special Appeals. Relying on *Richwind Joint Venture 4 v. Brunson*, 335 Md. 661, 645 A.2d 1147 (1994) and Section 358 of the *Restatement (Second) of Torts*, the Court of Special Appeals affirmed the judgment of the trial court. The intermediate appellate court held that "a plaintiff must present admissible evidence to permit a jury to infer that a landlord knew or had reason to know (1) that there was deteriorated paint on the premises, and (2) that the deteriorated paint contained lead." *Brown v. Dermer*, 120 Md.App. at 345, 707 A.2d at 411. The Court of Special Appeals was satisfied that the record contained "sufficient evidence from which a jury could infer that lead paint existed on the premises in 1984–85—when [the petitioner's] exposure to lead occurred," *id.* at 346, 707 A.2d at 410, and, "sufficient evidence from which a jury could infer that deteriorated paint existed on the premises in 1984–85 and that [the respondents] had knowledge or reason to know of that condition prior to January, 1986." *Id.* The court concluded, however, that "there is no ... evidence to show that [the respondents] knew or had reason to know that the deteriorated paint contained lead." *Id.*

The court also rejected the petitioners' alternative claim, that the failure of the respondents to abate the hazardous condition within a reasonable time after they received the BCHD notice exposed the petitioners to lead-based paint for an additional period and, thereby, caused the petitioners to suffer injuries. The court reasoned that there was insufficient evidence in the record to support this allegation. *Id.* at 349, 707 A.2d at 412. Specifically, the court concluded that the evidence on which the petitioners relied, did not support the claim factually. *Id.*[4]

---

4. That evidence was a note made at the Kennedy–Krieger Institute. While the note indicated that the minor appellants were placed in a cab to go to 4112 Hayward Avenue, it also indicated that the petitioners remained with their mother in a one room apartment at 2005 McCu-

We granted certiorari in this case, *Brown v. Dermer,* 350 Md. 279, 711 A.2d 871(1998), to determine whether the trial court correctly granted summary judgment, and to clarify the knowledge requirement in lead paint poisoning negligence actions based upon a violation of the housing code. Because we conclude that summary judgment should not have been granted, we reverse the judgment of the Court of Special Appeals and remand this case to the circuit court for further proceedings, consistent with this opinion.

## II.

The petitioners contend that the trial court's grant of summary judgment was legally incorrect. Citing *Richwind, supra,* and § 358 of the *Restatement (Second) of Torts,* they argue that, where an injury is proximately related to a violation of the housing code—which, they point out, defines *any* flaking, loose or peeling paint as an unsafe condition, *see* Baltimore City Code (1983 Repl.Vol.), Art. 13 §§ 702 and 703—the plaintiff, in order to survive summary judgment, need only present evidence that the defendant had notice of the noncomplying condition and a reasonable opportunity to correct it. *See Richwind,* 335 Md. at 674, 645 A.2d at 1153. As they see it, because sufficient evidence was present to allow a jury to conclude that the respondent had notice of flaking, loose or peeling paint on the premises, and that the condition was the proximate cause of their injury, the trial court should not have granted summary judgment in favor of the respondents. Alternatively, the petitioners argue that, even if knowledge of chipping, peeling and flaking paint is not enough, if the law requires the landlord to know or have a reason to know of the presence of lead-based paint before liability can attach, every landlord is presumed to know of the dangers of lead-based paint in older houses. In this case, they

---

llogh Street, thus tending to negate an inference that they were further exposed to lead paint in the premises.

Because we have determined that the petitioners' principal argument has merit, we need not, and therefore will not, address this alternative argument any further.

contend, the issue of the landlord's "reason to know" of the dangers of lead-based paint in older houses and of the reasonableness of a landlord's purported lack of knowledge is for a jury to decide after considering of all of the evidence. To hold otherwise, they argue, would invite landlord perjury.

As expected, the respondents maintain that the trial court correctly granted summary judgment in its favor. They, too, rely on *Richwind, supra,* and § 358 of the *Restatement (Second) of Torts.* Before liability can attach, the respondents argue, a landlord must have notice of a defective condition and a reasonable opportunity to correct it. *See Richwind,* 335 Md. at 674, 645 A.2d at 1153. As they see it, in order to overcome a motion for summary judgment in a lead paint poisoning action, a plaintiff must demonstrate that the defendant knew or had "reason to know" of the presence of lead-based paint in the premises and the risks that it presented. They assert that knowledge of flaking or chipping paint is not necessarily knowledge of an unsafe condition because nothing in the housing code informs owners that deteriorated lead-based paint could pose a health threat to young children. They argue further that, because the petitioners failed to rebut the Dermer's testimony that the Dermers did not know and, indeed, had no reason to know, of the presence and hazards of lead-based paint in the subject premises and in general, the trial court properly granted summary judgment, and the Court of Special Appeals properly affirmed that judgment.

### III

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Maryland Rule 2–501(e). . This Court discussed the summary judgment procedure in *Hartford Ins. Co. v. Manor Inn,* 335 Md. 135, 642 A.2d 219 (1994), explaining:

"The purpose of the summary judgment procedure is to decide whether there is an issue of fact sufficiently material to be tried, not to try the case or to resolve factual disputes.

*Gross v. Sussex, Inc.,* 332 Md. 247, 255, 630 A.2d 1156, 1160 (1993). *See Foy v. Prudential Insurance Company of America et al.,* 316 Md. 418, 422, 559 A.2d 371, 373 (1989); *Coffey v. Derby Steel Company,* 291 Md. 241, 247, 434 A.2d 564, 568 (1981). Thus, the review of the grant of summary judgment involves the determination whether a dispute of material fact exists, *Gross,* 332 Md. at 255, 630 A.2d at 1160; *Beatty v. Trailmaster,* 330 Md. 726, 737, 625 A.2d 1005, 1011 (1993), and "whether the trial court was legally correct." *Heat & Power Corporation v. Air Products & Chemicals, Inc.,* 320 Md. 584, 591, 578 A.2d 1202, 1206 (1990) (citations omitted). Pursuant to Maryland Rule 2–501(e), therefore, when the motion and response show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law, the trial court shall enter summary judgment for the moving party forthwith. *Gross,* 332 Md. at 255, 630 A.2d at 1160. The determination whether a genuine dispute of material fact exists and, if not, what the ruling of law should be, requires the reviewing court to resolve all inferences to be drawn from the pleadings, admissions, and affidavits, etc. against the moving party. *Id.* at 256, 630 A.2d at 1160. 'In other words, all inferences must be drawn against the moving party when determining whether a factual dispute exists, even when the underlying facts are undisputed.' " *Id.*

*Id.* at 145, 642 A.2d at 224.

Summary judgment generally is inappropriate when matters—such as knowledge, intent or motive—that ordinarily are reserved for resolution by the fact-finder are essential elements of the plaintiff's case or of the defense. *See Di Grazia v. County Executive for Mont. Co.,* 288 Md. 437, 445, 418 A.2d 1191, 1196 (1980); *Clea v. Mayor & City Council of Baltimore,* 312 Md. 662, 677, 541 A.2d 1303,1310 (1988). As was explained in *Federal Sav. & Loan Ins. Corp. v. Williams,* 599 F.Supp. 1184 (D.Md.1984), summary judgment is generally not appropriate for issues concerning knowledge, motive, or intent because "the facts concerning the defendant's knowledge and conduct, and the circumstances in which they exist-

ed, as well as any determinations of how they relate to the legal standard ... are best left for resolution by the trier of fact at trial." *Id.* at 1213. *See e.g. Stern v. United States Gypsum, Inc.,* 547 F.2d 1329, 1345 (7th Cir.1977)("Summary judgment motions are particularly inappropriate vehicles by which to judge subjective considerations such as motive, intent, or knowledge."). *See also, Staren v. American National Bank and Trust Company of Chicago,* 529 F.2d 1257, 1261–62 (7th Cir.1976); *Conrad v. Delta Air Lines, Inc.,* 494 F.2d 914, 918 (7th Cir.1974); *Schoenbaum v. Firstbrook,* 405 F.2d 215, 218 (2d Cir.1968), *cert. denied, Manley v. Schoenbaum,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969).

 Negligence is "any conduct, except conduct recklessly disregardful of an interest of others, which falls below the standard established by law for protection of others against unreasonable risk of harm." *Holler v. Lowery,* 175 Md. 149, 157, 200 A. 353, 357 (1938), quoting *Restatement of Torts* A.L.I. § 282. *See* William L. Prosser, *Handbook of The Law of Torts* § 43, at 250 (4th ed.1971). It does not exist apart from the facts and circumstances upon which it is predicated, *Baltimore, C. & A.R. Co. v. Turner,* 152 Md. 216, 228, 136 A. 609, 614 (1927); *Dickey v. Hochschild, Kohn & Co.,* 157 Md. 448, 450, 146 A. 282, 283, (1929); *Schell v. United Rys. & Elec. Co.,* 144 Md. 527, 531, 125 A. 158, 159 (1924), necessarily involves the breach of some duty owed by a defendant to the plaintiff, *Philadelphia, W. & B.R. Co. v. Kerr,* 25 Md. 521, 530 (1866), and is inconsistent with the exercise of ordinary care. *Paramount Development Corp. v. Hunter,* 249 Md. 188, 193, 238 A.2d 869, 871 (1968); *Brown v. Ellis,* 236 Md. 487, 497, 204 A.2d 526, 530–31, (1964). In order to establish a cause of action for negligence, the plaintiffs must prove the following elements: (1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty. *Richwind,* 335 Md. at 670, 645 A.2d at 1151 (citations omitted). *See Manor Inn,* 335 Md.

at 147–48, 642 A.2d at 225; *Southland Corp. v. Griffith,* 332 Md. 704, 712–13, 633 A.2d 84, 88 (1993).

■■■ Judge Cole, writing for the Court in *Ashburn v. Anne Arundel County,* 306 Md. 617, 627, 510 A.2d 1078, 1083 (1986), analyzed the first element:

> " 'Duty' in negligence has been defined as 'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.' . . . . There is no set formula for this determination. As Dean Prosser noted, 'duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' . . . In broad terms, these policies include: 'convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, [and] the moral blame attached to the wrongdoer. . . .' "

(quoting W. Page Keaton, *Prosser and Keaton on The Law of Torts,* § 53, at 164 (5th ed.1984)). *See Rosenblatt v. Exxon Co., U.S.A.,* 335 Md. 58, 76–77, 642 A.2d 180, 189–90 (1994); *Erie Ins. Co. v. Chops,* 322 Md. 79, 84, 585 A.2d 232 (1991); *Jacques v. First Nat. Bank of Maryland,* 307 Md. 527, 532, 515 A.2d 756, 758–59 (1986).

■■■ We also have observed:

> "[T]here can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another. It is consequently relative and can have no existence apart from some duty expressly or impliedly imposed. In every instance before negligence can be predicated of a given act, back of the act must be sought and found a duty to the individual complaining, the observance of which duty would have averted or avoided the injury. . . . As the duty owed varies with circumstances and with the relation to each other of the individuals concerned, so the alleged negligence varies, and the act complained of never amounts to negligence in law or in fact; if there has been no breach of duty."

*West Va. Central & P. R. Co. v. Fuller,* 96 Md. 652, 666, 54 A. 669, 671 (1903). We have recognized, however, that the concept of duty as owing to all persons the exercise of reasonable care to protect them from harm has to be limited if liability for unreasonably remote consequences are to be avoided. *Henley v. Prince George's County,* 305 Md. 320, 333, 503 A.2d 1333, 1340 (1986). One of the mechanisms utilized for that purpose is, and has been, application of the variable, foreseeability, which "involves a prospective consideration of the facts existing at the time of the negligent conduct," *Henley,* 305 Md. at 336, 503 A.2d at 1341, to the determination of whether a duty exists. *Ashburn,* 306 Md. at 627, 510 A.2d at 1083; *Henley,* 305 Md. at 333–34, 503 A.2d at 1340.

 A duty may be, and often, is prescribed by statute. *See e.g Schweitzer v. Brewer,* 280 Md. 430, 440–41, 374 A.2d 347, 353 (1977). Where that is the case, the courts will defer to the legislative determination:

"The general rule regarding the standard of conduct applied under our decisions to measure ... negligence does not supersede a prescription of conduct by the legislature. As we have indicated, what governs is the legislature's intention ... not necessarily what a 'reasonably prudent' person would do under such circumstances. We said in *Md. Medical Service v. Carver,* 238 Md. 466, 478, 209 A.2d 582, 588 (1965):

"If the legislative intent is expressed in clear and unambiguous language, this will be carried into effect by this Court even if this Court might be of the opinion that the policy of the legislation is unwise, or even harsh or unjust, if no constitutional guarantees are impaired by the legislation."

*Id.* at 439–40, 374 A.2d at 353.

 It is well-settled that the violation of a statute may furnish evidence of negligence. *Richwind,* 335 Md. at 670–71, 645 A.2d at 1151–52; *Manor Inn,* 335 Md. at 155, 642 A.2d at 229; *Atlantic Mutual v. Kenney,* 323 Md. 116, 124, 591 A.2d 507, 510 (1991); *Aravanis v. Eisenberg,* 237 Md. 242, 259–60,

206 A.2d 148, 158 (1965). But the mere violation of a statute will not sustain an action for damages unless the violation is the proximate cause of the injury. Proximate cause is established by determining whether the plaintiff is within the class of persons sought to be protected, and the harm suffered is of a kind which the drafters intended the statute to prevent. *Manor Inn,* 335 Md. at 156, 642 A.2d at 229; *Peterson v. Underwood,* 258 Md. 9, 15, 264 A.2d 851, 854 (1970); *Owens v. Simon,* 245 Md. 404, 409, 226 A.2d 548, 551 (1967). It is the existence of this cause and effect relationship that makes the violation of a statute *prima facie* evidence of negligence. *Liberto v. Holfeldt,* 221 Md. 62, 65, 155 A.2d 698, 700 (1959).

The parties in the case *sub judice* direct our attention to the Baltimore City Housing Code which prescribes duties with regard to the lease of housing for human habitation. *See,* Baltimore City Code (1983 Repl.Vol.), Art. 13 §§ 701 to 708. The purpose of the housing code is to:

> "establish and maintain basic requirements, standards and conditions essential for the protection of the health, safety, morals and general welfare of the public ... in the City of Baltimore; to establish minimum standards governing the condition, use, operation, occupancy and maintenance of dwellings ... in order to make the dwelling safe, sanitary and fit for human habitation"

*See* Art. 13 § 103. In accordance with this purpose, the City Council, in clear and express terms, *see* Art. 13 § 702, § 703, § 706, has required landlords to ensure that leased dwellings are fit for human habitation, that is, are safe and sanitary to occupy. Section § 702 provides:

> "Every building and all parts thereof used or occupied as a dwelling shall, while in use ... be kept in good repair, in safe condition, and fit for human habitation...."

Pursuant to § 703, defining the standards for good repair and *safe condition,* interior "walls, ceilings, woodwork, doors and windows shall be kept clean and free of *any* flaking, loose or peeling paint and paper." § 703(2)(c) (emphasis added). Sec-

tion 706 addresses interior wall covering and paint. It provides:

> "All interior loose or peeling wall covering or paint shall be removed and the exposed surface shall be placed in a smooth and sanitary condition. No paint shall be used for interior painting of any dwelling, dwelling unit, or rooming unit unless the paint is free from any lead pigment."

Moreover, the housing code prohibits an owner from "leas[ing] or permitt[ing] the subletting to another for occupancy any vacant or vacated dwelling or dwelling unit which does not comply with [its] provisions...." § 1001. Further, § 9–14.1 provides:

> "In any written or oral lease or agreement for rental of a dwelling intended for human habitation, the landlord shall be deemed to covenant and warrant that a dwelling is fit for human habitation."

The housing code also provides for notice to those who violate its provisions and for the correction of any defective conditions caused thereby. Article 13 § 301 provides:

> "Whenever the Commissioner of Housing and Community Development determines that there has been a violation of any provision of this Code or of any rule or regulation adopted pursuant hereto, he shall give notice of such alleged violation to the person or persons responsible therefor as hereinafter provided."

Section 303 requires the Commissioner to "order the necessary corrections by notice and service" as therein provided.

In *Richwind*, this Court reviewed the requirements of §§ 702, 703 and 706. We concluded that:

> "[t]he implied warranty of habitability established by §§ 702 and 703 *necessarily includes* flaking, loose or peeling *lead-based* paint within the scope of hazardous conditions that render the premises unfit for human habitation. Thus, a landlord leasing property in Baltimore City is under a statutory obligation to correct such a hazardous condition even in the absence of a contractual duty to do so."

335 Md. at 671, 645 A.2d at 1151. (emphasis added). The Court then recognized, quoting, with approval *Restatement (Second) of Property, Landlord and Tenant* § 17.6,[5] that violation of the city code provisions just referenced may be the basis for a negligence action. We opined:

> "a private cause of action in a landlord/tenant context can arise from a violation of any statutory duty or implied warranty created by the Baltimore City Code. If [the defendant] violated one of the city code provisions, that violation could provide the basis for a negligence action against it and its agent...."

*Id.* at 672, 645 A.2d at 1152.

From the foregoing, it is clear that it is unlawful to lease a dwelling with flaking, loose or peeling paint and that no premises are to be leased for human habitation, except those that are fit for human habitation, *i.e.* those that are kept in good repair and safe condition as defined in the Baltimore City Code. To be sure, § 706 prohibits the use of lead-based paint for interior painting in a dwelling unit; however, neither it nor §§ 702 or 703 limits the prohibition of flaking, loose or peeling paint to lead-based paint. To be a violation, all that must be shown is that there was flaking, loose or peeling paint, without any further showing as to the content of the paint. Moreover, none of the provisions of the Housing Code premises violation on the landlord's knowledge of the hazards of lead-based paint.

The plaintiff, however, still bears the burden of pleading and proving that the landlord had notice of a defective condition on the premises. Thus, to survive summary

---

**5.** Section 17.6 provides as follows:

"A landlord is subject to liability for physical harm caused to the tenant and others upon the leased property with the consent of the tenant or his subtenant by a dangerous condition existing before or arising after the tenant has taken possession, if he has failed to exercise reasonable care to repair the condition and the existence of the condition is in violation of:

(1) an implied warranty of habitability; or

(2) a duty created by statute or administrative regulation."

judgment, a plaintiff alleging lead paint poisoning caused by a landlord's negligence in failing to correct a defective condition in a leased dwelling must first meet the "reason to know" test. Under this test, a plaintiff must present evidence that establishes that the landlord knew or had reason to know of a condition on the premises posing an unreasonable risk of physical harm to persons in the premises. *See Restatement* § 358(1)(b) ("knows or has *reason to know* of the *condition* ") (emphasis added). The fact that a defendant is a landlord or engages in a certain trade is not enough to meet the reason to know standard. Some evidence that, by virtue of those facts, the defendant has knowledge sufficient to support an inference of knowledge of the condition is required. *Id.* at 677, 645 A.2d at 1154–55. It follows that, in order to present the question of the respondents' negligence to the jury in a lead poisoning negligence action based upon a violation of the statutory duties in §§ 702 and 703, as is the case *sub judice*, all that a plaintiff must show in order to satisfy the reason to know element is that there was flaking, loose or peeling paint and that the defendant had notice of that condition. It need not be shown that the flaking, loose or peeling paint was lead-based.

 Once it is established that the landlord has reason to know of the defective condition, *i.e.*, the existence of flaking, loose or peeling paint, a plaintiff must present facts that establish that he or she or a landlord of ordinary intelligence with the same knowledge, should realize the risk of lead poisoning. The test at this stage is one of foreseeability; it encompasses what a person of ordinary prudence should realize, not what he or she actually did know or realize. Thus, the only question for the court to decide at the summary judgment stage is whether the lead-based paint injury is without, or within, the range of reasonable anticipation and probability.

In *Richwind* we applied the aforementioned test. Among the issues presented in that case were "whether the city code's notice provisions expand common law liability, and whether Richwind or its agent had adequate notice and/or knowledge

of this hazardous lead paint condition." 335 Md. at 672, 645 A.2d at 1152. As to the former, commenting that both Article 13, §§ 301 and 303 of the Housing Code and the common law of this State require notice and a reasonable opportunity to correct a defective condition, *see Scott v. Watson,* 278 Md. 160, 169, 359 A.2d 548, 554 (1976); *Ramsey v. D.P.A. Associates,* 265 Md. 319, 322, 289 A.2d 321, 323 (1972); *Katz v. Holsinger,* 264 Md. 307, 311, 312, 286 A.2d 115, 118 (1972); *Elmar Gardens, Inc. v. Odell,* 227 Md. 454, 458, 177 A.2d 263, 265–66 (1962); *State v. Feldstein,* 207 Md. 20, 29–34, 113 A.2d 100, 104–06 (1955), the Court held that the notice provisions in the City Code neither expanded nor superceded the common law requirements and, indeed, "appear consistent with each other as they apply to the prerequisite of knowledge and/or notice." *Id.* at 674, 645 A.2d at 1153. We explained that:

"[b]oth require that a landlord have notice of the dangerous condition on the property and a reasonable opportunity to correct it. Neither impose upon [the defendant] a duty to periodically inspect the premises during the leased period for dangerous conditions to determine if repairs are necessary. To hold otherwise would circumvent years of unbroken precedent concerning such a duty, and might force landlords to become the 'insurers' of their tenants, a policy which has been repeatedly rejected by the courts of this State,"

*Id.* (citations omitted). We therefore concluded that the notice and knowledge requirements remain the same regardless of the source. *Id.* at 675, 645 A.2d at 1154.

The *Richwind* Court then turned to the sufficiency of the evidence question, concluding that sufficient evidence had been presented to permit a jury to find that the landlord had notice of a dangerous condition on the premises and breached the duty to correct it. *Id.* at 679, 645 A.2d at 1157. To reach that conclusion, the Court applied Section 358 of the *Restatement (Second) of Torts.*[6] The evidence to which Section 358

6. That section, headed "Undisclosed Dangerous Conditions Known to Lessor," provides:

was applied was that the tenant, who resided in the premises prior to their acquisition by the landlord, forwarded, at the invitation of the owner's management company, a series of

"(1) A lessor of land who conceals or fails to disclose to his lessee any condition, whether natural or artificial, which involves unreasonable risk of physical harm to persons on the land, is subject to liability to the lessee and others upon the land with the consent of the lessee or his sublessee for physical harm caused by the condition after the lessee has taken possession, if

"(a) the lessee does not know or have reason to know of the condition or the risk involved, and

"(b) the lessor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to expect that the lessee will not discover the condition or realize the risk."

The Court also relied on Comment b to § 358:

"In order for the rule stated in this Section to apply, it is not enough that the dangerous condition of the land is one which might be discovered by a reasonable inspection of the premises. The lessor is under no duty to his lessee, or to any other person entering the land, to make such an inspection, except where premises are leased for a purpose involving the admission of the public, as stated in § 359.

"It is not, however, necessary that the vendor have actual knowledge of the condition, or that he be in fact aware that it involves an unreasonable risk of physical harm to persons on the land. It is enough that he has reason to know that the condition exists, as that phrase is defined in § 12(1) ...,"

as well as the distinction that this Court has drawn between "reason to know,"required by § 358, and "should know," utilized in other sections:

" 'Both the expression 'reason to know' and 'should know' are used with respect to existent facts. These two phrases, however, differ in that 'reason to know' implies no duty of knowledge on the part of the actor whereas 'should know' implies that the actor owes another the duty of ascertaining the fact in question. 'Reason to know' means that the actor has knowledge of facts from which a reasonable man of ordinary intelligence or one of the superior intelligence of the actor would either infer the existence of the fact in question or would regard its existence as so highly probable that his conduct would be predicated upon the assumption that the fact did exist. 'Should know' indicates that the actor is under a duty to another to use reasonable diligence to ascertain the existence or non-existence of the fact in question and that he would ascertain the existence thereof in the proper performance of that duty.' "

*Richwind Joint Venture 4 v. Brunson*, 335 Md. 661, 676–77, 645 A.2d 1147, 1154 (1994), quoting *State v. Feldstein*, 207 Md. 20, 33, 113 A.2d 100, 106 (1955) (quoting *Restatement of Torts* § 12 cmt. a (1934)) and *Restatement (Second) of Torts* § 12.

complaints about the disrepair of her apartment, including "[chipping and flaking] paint and plaster from the walls." *Richwind* at 668, 645 A.2d 1147. Although workers were dispatched to correct the problems, neither the landlord nor the president of the management company inspected the work to determine whether the repairs had been made adequately. *Id.* at 668, 645 A.2d at 1150. Evidence had also been presented that the president of the management company, who had approximately sixteen years of experience as a property manager and worked for two years as a Baltimore City Housing Inspector, was aware that houses built before 1957 often contained lead-based paint, that the subject property was built before 1957, and that peeling lead-based paint was dangerous to children. *Id.* at 678–79, 645 A.2d at 1156.

While the *Richwind* Court found that the landlord could be held liable for failing to correct the defective lead paint condition, *Richwind* does not establish a factual threshold for all lead poisoning cases. The plaintiffs in *Richwind* satisfied a higher burden than a strict application of the two prong test discussed above. Rather than rely on the fact that the defective condition was specifically addressed by the housing code and, in fact, involved provisions setting minimum standards and thereby giving meaning to the warranty of habitability, the plaintiffs in that case presented extrinsic evidence of the landlord's knowledge of housing stock and of the lead paint hazard. Presenting such evidence certainly is appropriate and, as *Richwind* attests, is effective, perhaps the most effective and safest way to proceed, but it is only one option. The jury in *Richwind* also could have found that the defendant's breach of statutory duty prescribed by the housing code was proximately related to the injury alleged, without specifically finding that the defendant had actual knowledge or reason to know of the presence or hazards of lead-based paint.

This Court applied the *Richwind* holding in a companion case, *Scroggins v. Dahne*, 335 Md. 688, 645 A.2d 1160 (1994). In that case, the Court reviewed two cases, *Scroggins* and *Davis v. Stollof*, involving lead poisoning injuries sustained by children. Both presented the same legal issue as *Richwind*—

whether a landlord can be held liable for lead poisoning when the landlord had no knowledge of flaking lead-based paint in rented premises. *Id.* at 690, 645 A.2d at 1161. In both cases, we held that summary judgment was properly granted because the landlord did not receive notice of the dangerous condition. *Id.* at 691, 645 A.2d at 1161.

In *Scroggins,* violation of the statute could not serve as notice of the dangerous condition because the plaintiff did not establish the cause and effect relationship between the violation and injury. In that case, there was no dispute that the landlord did not receive timely notice of flaking paint in the apartment. *Id.* at 692, 645 A.2d at 1161. The plaintiff argued, instead, that the law should impute notice to the landlord because the landlord had notice of a hole in the wall, and if he had come to the apartment to repair the hole he would have seen flaking paint. This Court rejected this argument, reasoning that,

> "[i]t appears from the evidence that the plaintiff notified the landlord of the hole in the wall sometime between when she noticed the child eating the plaster and when she took the child to the hospital two days later. Evidence from the plaintiffs' own expert ... indicates that the plaster around the hole was not the source of the child's lead poisoning, and there is no evidence to indicate that any other notice of flaking or peeling paint was given to the landlord prior to that time."

*Id.* The Court also observed that, even if there were a hazardous condition on the premises, "[t]he short period between when [the plaintiff] saw her son eating the plaster and when the child was diagnosed with lead poisoning was insufficient to provide the landlord with notice and a reasonable opportunity to correct the condition."*Id.* at 693, 645 A.2d at 1162. Consequently, this Court concluded "the trial judge did not err in concluding that notice of a hole in a wall on the premises did not establish a basis for concluding that the landlord had reason to know there was chipping, flaking, or peeling, lead-based paint on the premises." *Id.*

Similarly, in *Stollof,* this Court stated that "the record clearly shows that no notice concerning any paint problems was ever given to the landlords prior to [the defendant's] injury." *Id.* at 695, 645 A.2d at 1163. The Court also rejected the plaintiff's argument that the fact that the defendants did not paint the premises for seven years is evidence of negligence. As to that, we said:

> "although paint in one location may flake in less than seven years, paint in another location may last well beyond seven years with no signs of flaking. Therefore, we believe that the mere fact that the premises in question were not painted for seven years is not, by itself, evidence of negligence. The tenant, seeing the premises on a daily basis, is in the best position to observe flaking paint. Thus, notice of such a condition is a prerequisite to recovery by the plaintiff in a negligence action. *See Richwind,* 335 Md. at 676, 645 A.2d at 1154."

*Id.* at 695–96, n. 4, 645 A.2d at 1164, n. 4.

In the case *sub judice,* the first prong of the test is clearly satisfied. The petitioners' mother testified that she complained to the respondents about the deteriorating condition of the paint well before the petitioners were born. The respondents of course deny receiving notice of the condition. Accepting the petitioner's explanation as true, as the law requires the trial court to do,[7] we conclude that a genuine dispute of material fact exists regarding the landlords' knowledge of the dangerous condition.

The second prong is also satisfied. The lead poisoning injury alleged here is within the range of reasonable anticipation and probability. Patently, by enacting §§ 702 and 703 of the Housing Code, the City Council sought to protect children from lead paint poisoning by putting landlords on notice of conditions which could enhance the risk of such injuries. As far back as the early 1930s childhood lead paint poisoning was

---

7. *See Goodwich v. Sinai Hosp. of Baltimore, Inc.,* 343 Md. 185, 207, 680 A.2d 1067, 1078 (1996); *Manor Inn,* 335 Md. at 145, 642 A.2d at 224; *Gross v. Sussex,* 332 Md. 247, 256, 630 A.2d 1156, 1160 (1993)

a problem in the City of Baltimore [8] and, in 1966, the city Council addressed this problem by enacting the provisions discussed herein.[9] Moreover, the respondents acknowledged that they were aware of the Baltimore City and Maryland State laws banning lead-based paint, and of the City ordinances that required rental properties to be kept in a habitable condition, including requiring the interior surfaces to be kept free of loose, flaking or peeling paint. Under these circumstances, we hold that a jury could find that a reasonably prudent landlord would realize, after receiving notice, that flaking, loose or peeling paint presents an unsafe or dangerous condition and thus would investigate and correct the condition.

---

**8.** *See Chronology of Lead Poisoning Control in Baltimore 1931–1971,* Balt. Health News, Volume XLVIII, No. 12, April 3, 1971 (providing chronology of lead poisoning in Baltimore City from 1931 up to and beyond the passing of the housing code in 1966 and noting that the greatest source of lead poisoning is flaking, peeling paint.) *See also, Lead Poisoning Kills 22 Here in Three Years,* Balt. Sun, April 4, 1937; *One Dead, 5 in Hospital From Rare Lead Poisoning,* Balt. News Amer., Aug. 2, 1940; *7 Children Poisoned in July From Nibbling Led Paint,* Balt. Sun, Aug. 12, 1946; Dr. Huntington Williams and Joseph Gordon, *Death at the Window Sill,* Balt. Afro–Amer., May 13, 1958; *Drive on Lead Paint Opened By City,* Balt. Evening Sun, Feb. 9, 1960; Donald Bremner, *New Method Used to Fight Poisoning by Lead Paint,* Balt. Evening Sun, July 17, 1962; *Four Children Poisoned by Lead Paint in '66,* Balt. Evening Sun, June 15, 1966.

**9.** The legislative history of the housing code shows that §§ 703 and 706 were written to prevent childhood lead poisoning. The proposed § 703, defining good repair and safe condition, contained a sentence prohibiting the use of lead-based paint. *See* Letter from R.L. Steiner, Director, *Baltimore City Urban Renewal and Housing Agency* to Guy T.O. Hollyday, Chairman, *Housing Code Committee* (Letter is undated; however, a memorandum that is attached and refers to the letter is dated April 10, 1963). An amendment was made to add Section 706 which addressed the lead-based paint concerns in greater detail by requiring that, loose flaking paint be removed, that the surface be properly prepared for repainting and that repainting be done with non lead-based paint. *Id.* The reference to lead paint was then removed from Section 703 as redundant, but the City Council left intact the provision that defined the presence of any flaking, loose or peeling paint as an unsafe condition. *See* Balt. City Code (1983 Repl.Vol.), Art. 13 § 703. It is evident from the exclusion of language referring to the type of paint and the historical context in which the housing code was written that these provisions were aimed at preventing childhood lead poisoning.

The effectiveness of the housing code in promoting health and safety would be severely undermined if landlords were permitted to use lack of knowledge that the flaking paint was lead-based paint as a defense against civil liability for injuries proximately caused by their failure to comply with the law.

The respondents argue that, "[t]o hold a property owner liable in the absence of such particular notice [of the hazards of lead] paint is to impose strict liability, a standard which neither Maryland nor any other jurisdiction imposes on landlords." They and Amici cite *Winston Properties v. Sanders,* 57 Ohio App.3d 28, 565 N.E.2d 1280 (1989) and *Garcia v. Jiminez,* 184 Ill.App.3d 107, 132 Ill.Dec. 550, 539 N.E.2d 1356 (1989) for this proposition. We do not agree.

Both *Winston* and *Garcia* are distinguishable. In *Winston,* an intermediate appellate court decision, the court affirmed a grant of summary judgment in favor of a landlord where the landlord filed an affidavit that he did not know of the existence of lead-based paint on the property until the municipal authority issued a violation notice. 565 N.E.2d at 1282. There, to be sure, the court held that notice of peeling paint was insufficient to establish liability; however, unlike the present case, the statute being interpreted by the court specifically prohibited flaking *lead-based* paint. *Id.* at 1281.[10] Understandably, where the statute is specific as to what must be

---

**10.** The court in *Winston* applied Section 00053–15 of the Cincinnati Board of Health Regulation (Amended, Jan. 28, 1973; a. Nov. 23, 1976) entitled, "Regulating the Sale and Use of Paint Containing More Than 1 Percent of Metallic Lead." That section provides, in pertinent part:

"(C)
1. Loose and flaking paint containing lead in excess of five-tenths percent on interior or exterior surfaces of any property accessible to small children shall be removed or made inaccessible and/or the surfaces recovered with paint or other covering. If paint is used, it shall not contain lead in excess of five-tenths percent.
2. Interior and exterior surfaces of property found to have coatings which contain lead in excess of five-tenths percent limit, when said coatings are identified as the probable source of undue lead absorption or lead poisoning in human beings, shall have the coatings removed, covered or made inaccessible to small children. When paneling or other covering is used, it shall cover the wall at least four feet above floor level."

proven, a defendant may plead lack of notice of a "condition" that does not fall within the statute, because knowledge of the noncomplying condition necessarily includes knowledge of the presence of *lead-based* paint. On the other hand, where flaking, loose or peeling paint defines the condition without reference to the content of the paint, the landlord can be held to have notice of a condition from which the trier of fact could conclude that the threat of injury is reasonably foreseeable.

Likewise, in *Garcia,* another intermediate appellate court decision, the court held that the landlord was not under a duty to foresee that paint chips in an apartment created a dangerous condition making injury to the child foreseeable and creating a duty upon the landlord to remedy the situation. 132 Ill.Dec. 550, 539 N.E.2d at 1357–58. It opined:

> "In our opinion, paint chips, like dirt, coins, stones, or other objects that children may place in their mouths, are not in and of themselves sufficient as a matter of law to establish the dangerousness that makes an injury foreseeable and creates a duty to remedy. However, the actual or constructive knowledge that the paint chips contain a toxic substance, such as lead, combined with the actual or constructive knowledge that a child may ingest those paint chips, will create such a duty."

*Id.* 132 Ill.Dec. 550, 539 N.E.2d at 1359.

However, the *Garcia* court did not base its decision on the violation of a statutory duty; instead, it relied upon common law principles of proximate cause and foreseeability to determine whether the landlord had a duty to act, and the issue of whether the landlord had knowledge of a dangerous condition was presented to the jury. *Id.* 132 Ill.Dec. 550, 539 N.E.2d at 1358–59. Concerning the landlord's notice of the dangerous condition, the court commented:

> "[p]laintiff was allowed to allege and prove that the premises contained lead-based paint, thus establishing the element of the existence of a dangerous condition. As defendant's actual or constructive knowledge of the dangerous condition is required to establish liability, defendant was entitled to

deny knowledge of that condition at trial. Thus, the trial court's orders denying plaintiff's motion in limine and his motion for directed verdict were not error.... The jury may have concluded that defendant did not know or have reason to know that the premises contained lead-based paint, or even that defendant did not know or have reason to know that the paint was peeling."

Contrary to the respondents' argument, it seems apparent, that what the Baltimore City Council sought to do by enacting the ordinances at issue in this case was prevent such "lack of knowledge" defenses by putting landlord on notice that any flaking paint is considered a dangerous condition.[11]

Furthermore, the holding in this case does not impose strict liability. The finder-of-fact is free to reject the evidence offered to prove that the respondent violated the housing code and/or that the respondents had notice of the noncomplying condition. The finder-of-fact may also reject evidence offered to prove the injury, if any, was of the kind that was reasonably foreseeable as a result of the respondent's negligence.

Finally, the respondents argue that they are "electricians and plumbers by trade" and are not "professional property owners." They argue that "[a] distinction must be made between non-professional, unsophisticated property owners

---

**11.** We decline the respondents' invitation to follow *Hayes v. Hambruch*, 841 F.Supp. 706 (1994, D.Md.), on which *Richwind* relied. *See* 335 Md. at 688, 645 A.2d at 1155. In *Hayes* a federal district court, reviewing the same provisions of the housing code discussed herein, found that, although a landlord knew about flaking paint on the leased premises, he had no " reason to know" that the flaking paint contained lead. 841 F.Supp. at 711. Thus, that court concluded that, "[a]bsent notice to a landlord of the existence of lead paint in leased premises, the landlord cannot be expected to reasonably foresee the lead poisoning of a child living in those premises." *Id.* It is significant that the *Hayes* court relied primarily on *Garcia v. Jiminez*, 184 Ill.App.3d 107, 132 Ill.Dec. 550, 539 N.E.2d 1356 (1989) and *Winston Properties v. Sanders*, 57 Ohio App.3d 28, 565 N.E.2d 1280 (1989), which we have discussed and distinguished, to reach that result. As *Richwind*'s reliance on *Hayes* was not necessary to its holding, we decline to follow it here.

. . . and professional property owners who own hundreds of rental properties . . . ." We reject this argument.

Black's Law Dictionary defines a Landlord as " [o]ne who leases real property to another." Black's Law Dictionary 883 (7th ed.1999). The housing code defines an "operator," as "any person who has charge, care or control of a building . . . in which dwelling units . . . are let. . . ." *See,* Balt. City Code (1983 Repl.Vol.) Art.13, § 105. In Baltimore City, therefore, the obligation to comply with the law begins with the first dwelling let for money. One who leases a dwelling thereby becomes a landlord and is required to know the law and live up to the standards of the profession, regardless of the profession title they assign themselves.[12] There is no principled basis on which to draw a distinction, as a matter of law, between a landlord who leases one property and another who leases one hundred properties.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND REMAND THE CASE TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENTS.

---

12. The Dermers argue that they are plumbers by trade. Interestingly, and perhaps ironically, the word plumber is derived from the Latin word *"plumbum,"* meaning "lead" and *"plumbarius,"* meaning "lead worker." *See The American Heritage College Dictionary,* 1052 (3rd. ed.1997).