# BALTIMORE, CHESAPEAKE AND ATLANTIC RAILWAY COMPANY *v.* MABEL R. TURNER.

*Accident at Railroad Crossing—Contributory Negligence—Of Guest in Automobile—Evidence—Instructions.*

In an action on account of an injury received at a railroad crossing by an occupant of an automobile, it was error, after plaintiff had testified that her view of the train from the automobile was cut off by a "bean patch," to exclude testimony by the owner of the bean patch that it did not cut off the view, this being testimony as to a fact and not the expression of an opinion.
pp. 223-225

Counsel are entitled to frame their own questions to a witness, and are not required to propound them in the form suggested by the court.                              p. 224

In an action for an injury received at a railroad crossing, plaintiff's prayer that it was defendant's duty to give proper and sufficient signals by blowing its whistle or ringing the bell, in order to warn persons crossing its tracks, and that if it failed to do so and plaintiff, while exercising due care and caution, was injured as a result of such failure, she was entitled to recover, was not bad as withdrawing from the jury evidence as to plaintiff's failure to note warning signs on the highway and to take precautions to avoid the danger so indicated.          p. 226

Such prayer was, however, bad because, while stressing defendant's failure to ring its bell or sound its whistle, it ignored other equally important facts, such as the visibility of the train to plaintiff, and whether she noticed the warning signs.

pp. 226, 227

Negligence, whether primary or contributory, is a relative and not an absolute thing, and does not exist apart from the circumstances upon which it is predicated.                    p. 228

One riding as an invited guest in a private automobile is not bound, under all circumstances, to be on the lookout for possible danger, but is entitled to rely to some extent at least upon the driver's vigilance, if he appears to have ordinary skill and experience.                    p. 228

But if the guest knows, or should as a reasonably cautious person know, that danger may follow the operation of the car in a particular manner or in a particular course, he is guilty of negligence if he fails to take such measures as may be open to him to avoid it.                    p. 229

Whether, under the circumstances, the failure of a guest in an automobile to discover danger and to do what he can to avoid it is negligence is usually a question for the jury.    p. 229

A guest in a private automobile, occupying a rear seat, with another person seated in front of her, so as somewhat to obscure her view, *held* not guilty of contributory negligence as a matter of law, because she failed to see or read warning signals as she approached a railroad crossing, or to see a train which was screened by vegetation and gave no signal of its approach.

pp. 229, 230

Where the court would have been justified in rejecting a prayer altogether by reason of erroneous matter therein, the modification of the prayer by eliminating the objectionable part was not ground for reversal.                    pp. 230, 231

An order, on a motion for a new trial, requiring the defendant to waive its right of appeal as a condition precedent to the entry of a *remittitur* as to part of the verdict is invalid.        p. 231

*Decided January 27th, 1927.*

Appeal from the Court of Common Pleas of Baltimore City. (STUMP, J.).

Action by Mabel R. Turner against the Baltimore, Chesapeake and Atlantic Railway Company. From a judgment for plaintiff, defendant appeals. Reversed.

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, and PARKE, JJ.

*Ralph Robinson,* for the appellant.

*J. Cookman Boyd,* with whom was *F. Murray Benson* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The appellee in this case was injured on July 5th, 1925, in a collision between an automobile in which she was riding as an invited guest, and a railroad train, operated by appellant over its tracks. The accident happened between one and two o'clock in the afternoon of a clear, hot day, and at a point where the appellant's tracks intersect the state highway between Pittsville and Salisbury, some five or six miles from Salisbury. The automobile was an Overland sedan, and there were in it at the time six persons: Mr. Guy Winters, who owned and was at the time driving the car, Mrs. Winters, his wife, who was sitting on the front seat beside him, their two small children, one of whom was seated on the floor in the rear of the car, and one to the left of and on the same seat with Charles R. Turner, who sat in the middle of the rear seat next to his wife, and Mabel R. Turner, who sat on the right-hand side of the same seat.

As a result of the accident Mrs. Turner suffered quite severe injuries, for which she asked the appellant to compensate her, and upon its failure to do so, she brought this action, which resulted in a judgment in her favor from which the defendant, the Baltimore, Chesapeake and Atlantic Railway Company, appealed. There are ten exceptions, of which the first eight involve questions of evidence; the ninth relates to the rulings of the trial court on the prayers, and the tenth to an order disposing of a motion for a new trial.

Running through the entire case were two questions of fact upon which the appellee's right to recover mainly turned, and, before dealing with the exceptions, in order to grasp their relative significance and importance, the substance of the evidence material to them will be stated. These questions are: (1) At what point did the train first become visible to persons in the automobile in which appellee was riding looking towards it as it approached the crossing, and (2) whether certain roadside signals were so placed and so conspicuous that a person occupying appellee's position in the car in which she was riding should in the exercise of ordinary care have observed them. The record covers some two hundred and sixty-four pages; it contains much extraneous and immaterial matter, such as colloquies between court and counsel, much of the material evidence found in it is cumulative, and to attempt to state it all in any detail is unnecessary, and would tend more to confusion than clarity. We deem it sufficient, therefore, for the purposes of this case, to state briefly in narrative form its substance and effect.

The plaintiff's evidence tended to prove that she and her husband were invited guests in an Overland sedan automobile, owned by Mr. Winters, who was, at the time of the accident, driving it from Pittsville towards Salisbury over the state highway which runs from Ocean City through Salisbury; that the day was warm, and the windows of the car were open; that Mrs. Turner, who was on the rear seat behind Mrs. Winters, on the right hand side of the car, was not familiar with the location of the crossing in question, although she had recently driven over it, and that, because of the elevation of the concrete, she was unable to see the tracks and did not realize that they were nearing it; that as they drove along she looked out from time to time on either side at the scenery but more often on the right hand side, from which the train approached, but she did not see its approach, until it "merged past" a corn and bean "patch," when the automobile was about fifty or seventy-five feet from the crossing; that the "patch" of corn and the bean vines, starting

at the railroad about one hundred and twenty-five feet from the crossing and running at an obtuse angle from the railroad, prevented her from seeing the approach of the train until she was fifty or seventy-five feet from the crossing; that she did not hear it approaching, that no bell was rung, no whistle blown nor any other warning of its approach given; that eight or nine hundred feet away to the east (on her right hand side) there is a "patch of woods" through which the train which struck them (running east) passed; that on her right, as the car in which she was riding approached the the tracks, were several houses along the road, the nearest one to the railroad being about one hundred and fifty or one hundred and seventy-five feet from it; that from ten to twenty-five feet from the track there was a weather-beaten "stop, look, and listen sign" on two cross arms bolted to an upright piece of timber about ten or twelve feet back from the road; that farther from the crossing on the same side, in the field, about forty or fifty feet "back off the road," there was a square sign placed at an angle on an upright, which sign carried an oil advertisement, and also the legend, "railroad crossing" in small letters; that farther still from the crossing there was a small "state road" sign, so defaced that it indicated nothing at all; that the driver of the automobile saw the first of these three signs as he approached the crossing, but that Mrs. Turner saw none of them; that Mr. Turner, one of the occupants of the rear seat, when the automobile was about forty or fifty feet from the tracks, saw the train then about eight hundred feet away, approaching at a terrific speed; that Mrs. Winters, who saw it at the same time, exclaimed, "Oh, Guy, there is a train," and Mr. Winters, who was driving the car at about twenty-five or thirty miles an hour, applied his brakes, and it skidded or slid onto the tracks, where it was when the train struck it, and the train ran on for some eight or nine hundred feet before it stopped; that as a result of the collision Mrs. Winters was killed, and the other occupants of the car injured, some slightly and others more seriously.

The appellant's evidence amounted to a common traverse of a large part of that offered by the appellee to which we have referred, and tended to prove these facts:—That the engineer on the train which collided with the automobile blew two long and two short blasts on its whistle, which were plainly heard at the crossing; that it first blew as it emerged from a tract of woodland about 984 feet from the crossing, and when it stopped blowing its whistle a bell was rung until it was quite near the crossing; the automobile was visible to the fireman on the engine which drew the train; that the patch of butter beans which appellant said prevented her from seeing the approach of the train was over 186 feet from the crossing and the vines were trained on poles about five or five and a half feet high, and the "patch" consisted of three rows four feet apart, planted four feet apart in the row; that the "stop, look, and listen" cross arm sign was visible, legible, and conspicuous, located about twelve and a half feet from the track within the limits of the highway; that the oil sign was in a field about thirty and one half feet from the crossing and about nineteen feet from the concrete road way, was about thirty inches square, and there was conspicuously painted on it the words "railroad—danger"; that the state highway sign was of steel about fourteen by twenty-one inches, and was about two hundred and seventy-five feet from the crossing and eight and three-tenths feet from the edge of the road, and had on it the word "danger," which, while defaced, was legible; that all of those signs were on the east side of the road, or on the right hand of one approaching the crossing from the direction of Ocean City; that on the same side of the road there was a gas filling station 869 feet away from the crossing, a dwelling 570 feet away from the crossing and about 150 feet from the highway, and another dwelling and a group of outbuildings over 300 feet from the crossing; that the nearest point of this group of buildings to the road was about 318 feet from it, and the farthest point about 450 feet from it; that as the train approached the crossing it was running from forty to forty-five miles an hour,

and the fireman who was standing on the "apron" of the locomotive first saw the Winters automobile when it was about five hundred feet from the crossing, and he kept it continuously in view until immediately before the collision; that he had no reason to believe it would not stop, the view was unobstructed, and he had begun to ring the bell as soon as the long blasts on the whistle had sounded, and it was not until the engine was within seventy-five feet of the crossing that he saw that the automobile was not going to stop, and he then yelled to the engineer to stop, and the engineer at once applied the brakes, but was unable to avoid striking the automobile, and when the train finally stopped about seven or eight hundred feet beyond the crossing, a part of the motor was found jammed beneath the "pilot bolt" of the engine.

Returning now to the exceptions, as we have stated, the first eight related to the rulings of the trial court upon questions of evidence, and of these the seventh and eighth are waived, so that of these exceptions we are only asked to consider the first six, which all involve the same question and may be grouped. In dealing with these exceptions it must be noted that the defendant relied in part, if not mainly, on contributory negligence as a bar to the action, and that according to his theory of the case a vital link in that defence was the fact, if it could be shown, that the approaching train was in open and unobstructed view of persons approaching the crossing from the direction of Ocean City, and must have been seen by the occupants of the Winters automobile, had they looked in its direction, in ample time to have enabled them by the exercise of ordinary care to have avoided the collision. And that, as the appellant had the right to operate its trains at any speed consistent with the safety of its passengers, the only negligence with which it was charged was its alleged failure to give some adequate signal of its approach, and that if it were in plain view of one approaching the crossing, its failure to give such warning would not be so likely to result in injury to travelers on the highway, as if its approach were concealed by trees,

shrubbery, growing plants, or other obstructions, and whether it could have been seen by the plaintiff or the driver of the automobile, in time to have enabled them by the use of ordinary care to have avoided the accident, would bear to some extent upon the question of whether it was guilty of primary negligence in failing to give such warning.

George W. Brown owned the farm on which the corn and butter bean "patch," which appellee alleged screened the approaching train from her view, was located, and after describing the "patch" of corn and beans, he was asked these questions, which are involved in the exceptions under consideration: "Now, state whether or not a person travelling along the highway, between your house and the crossing, could see a train as it emerged from the woods, notwithstanding the fact the butter beans and corn were there? * * * Now, will you say whether or not this patch of corn and butter beans, to which you have referred in your testimony, would screen the view of a train approaching from the right from a person travelling along the highway from the entrance of your place to the railroad crossing? * * * Will you state in what way, if any, this patch of beans or corn obscured the view of the approach of the train on the right of a person travelling in a machine from the entrance of your place to the railroad crossing? * * * Did or did not the patch of beans and corn interfere with the view of the train as it approached the crossing from the right of a person travelling in a machine from the entrance to your place to the railroad crossing? * * * Now, did you or not mean to say that this patch of beans and corn would interfere with the view of a train approaching from the right? * * * Could you see a train as it approaches from those woods on the right of the bean poles?"

Objections to all of these questions were sustained, and while the witness was permitted to describe the "patch" of beans, he was not allowed to say whether they would prevent a person approaching the crossing from seeing an oncoming train, notwithstanding the fact that Mrs. Turner had already

testified that they had prevented her from seeing it. In testifying to that she was obviously testifying to a fact, and not expressing an opinion, for it is not easy to conceive of a more tangible and concrete fact than that an obstruction, whether it be a house, a hill, or a "patch" of beans, shuts out the view. And if she was able to testify that the "patch" of beans did cut off her view of the approaching train, there is no reason known to us why others, having the same faculties and at least as much knowledge of the situation as she had, should not be allowed to testify that it did not cut off the view of an approaching train. The only suggestion made in support of these rulings is that they called for an opinion, and that the court suggested what counsel for appellee considered the "proper" questions which he should have asked. But the questions suggested by the court were not directed to the same point as those propounded by counsel for appellant. Counsel are not required to propound questions suggested by the court, but they are entitled to frame their own questions, and, so long as they violate no rule of law, procedure, or evidence, to elicit through them such facts as will in their judgment tend to support their claims, and the point is not whether the questions suggested by the court were proper, but whether those asked by counsel were improper. Nor do the questions call for the expression of an opinion. If one standing in front of a building is asked whether he can see a person behind it, he is not asked for an opinion but for a fact. And the effect of these questions is no more than that. Brown, who lived on the spot, was asked whether the patch of beans would screen an approaching train from the view of persons approaching the crossing along the state highway between his house and the crossing. It either did or it did not, and any one familiar with the situation could have told at a glance whether it did or did not; and the witness, who had seen the highway, the bean patch, and the railroad, was asked to tell, not what he thought or believed, but what he saw and knew. The questions therefore asked for infor-

mation based on knowledge and not on a mere belief or opinion. An opinion is a belief based upon inferences drawn from ascertained or assumed facts, the soundness of which depends both on the truth of the premises and upon the knowledge, skill, and intelligence of the witness, and is to be distinguished from positive knowledge based upon the direct evidence of the senses. The testimony of certain of the witnesses in the case as to whether a bell was rung or a whistle blown illustrates very well the distinction between knowledge and opinion. Witnesses for the plaintiff said that the whistle was not blown, nor the bell rung, as the train approached the crossing, because if they had been, they would have heard them. That was obviously an opinion based upon the assumed fact that had the whistle been blown or the bell rung they must have been audible, under the conditions, by persons whose sense of hearing was normal. Other witnesses testified that they actually heard these signals, and, if their testimony is true, they testified to actual knowledge gathered from the evidence of their own senses. Such opinions, however, are universally admitted in evidence, for the reason that they are nothing more than "knowledge at short hand," because, as stated in *Balto. & Yorktown Turnpike v. Leonhardt,* 66 Md. 70, 78: "There are, however, cases where all the facts cannot be detailed to the jury, which are necessary for a proper understanding of the subject. In speaking of a precipice, or of the condition of a road which is founderous or dangerous for travel, or of numbers, weights, heights, distances, and other like subjects, it would rarely be practicable for a witness to give the jury a satisfactory idea of the things described, without stating his opinion of them." There was error in refusing to permit these questions to be asked, and we are unable to say that the appellant was not injured by it, because these rulings in effect precluded it from offering evidence to contradict that offered by the plaintiff on one of the most important issues of fact in the case, and it cannot be said that it was not adversely affected by them.

The ninth exception relates to the rulings on the prayers. The plaintiff's first prayer instructed the jury, that it was the duty of the defendant to give "proper and sufficient signals by blowing its whistle or ringing its bell" to warn persons against crossing the tracks, and that if it failed to give "said proper and sufficient signals" of the approach of the train, and the plaintiff while exercising due care and caution was injured as a result of such failure, that she was entitled to recover. It is contended that that prayer is bad because it withdraws from the consideration of the jury evidence tending to show that the appellee was negligent in failing to note certain warning signs on or near the highway, and to take precaution to avoid the danger which they indicated was imminent. But we do not think the prayer is bad for that reason, because it did not permit a recovery unless the jury found that the plaintiff was injured as a result of defendant's failure to give "proper and sufficient signals" of its approach, while she herself was exercising due care. *Balto. & O. R. Co. v. McCabe,* 133 Md. 223, 224. But while the prayer was not objectionable for that reason, it was bad because, while it stressed the failure of the defendant to ring its bell or sound the whistle on the locomotive as conclusive evidence of negligence, it ignored other facts of equal importance, such as the visibility of the train to the appellee or whether she noticed the warning signs, and the jury may well have gotten the impression from it, that the defendant was liable if it failed to give such signals even though they believed that the plaintiff could and did see the approaching train in time to have warned the driver of its approach. It is true that the prayer required the jury to find that the plaintiff was using due care and caution at the time of the accident before it found in her favor, but in such a case as this that was not enough. It should have required the jury to consider whether the plaintiff could have seen the approaching train in time to have avoided the accident, and whether she could have seen and read the warning signs along the road, for if she saw the train, she did not need the sound of a bell or whistle to tell

her what it was or that it was approaching the crossing to-
wards which the automobile was going, and if she saw the
signs she must have known that she was approaching a rail-
road crossing. And while the legal principles stated in it
are unobjectionable, we think the prayer itself open to objec-
tions pointed out by Judge Boyd in *Wash., B. & A. R. Co. v.
Stale,* 136 Md. 113, etc., where, in dealing with a prayer sim-
ilar somewhat in form, he said: "Inasmuch as that prayer
specifically referred to Miss Hall not driving the automobile,
not having control over it, etc.—thus emphasizing those mat-
ters—the jury might well have been misled as to other duties
which she was called upon to perform in the exercise of due
care, and which were more important to be considered by
the jury under the circumstances of this case. Whether or
not she used due care in looking for an approaching car and
informing the driver of its approach, if she saw one, or could
have seen it, in time to warn the driver, whether the position
she occupied in the car was negligence directly contributing
to the accident, and whether she should have warned the
driver in approaching the crossing, if the jury found that
the automobile was running at an excessive speed, were more
material under the evidence, yet the prayer only selected such
matters as were not involved in much doubt, and specifically
referred to them. Merely submitting such matters under the
general statements, such as, 'or otherwise (could have)
avoided such collision by the exercise of ordinary care and
prudence on her part,' etc., was not enough. Inasmuch as
the jury were instructed that if they found the facts therein
stated, 'their verdict should be for the plaintiff,' and the
prayer so prominently brought before them the questions
referred to, but omitted all reference to those which were
actually the material facts to be determined in reference to
her negligence it was a defective prayer." And for the
reasons given in that case we think that the error in granting
this prayer was reversible.

The plaintiff's second prayer is somewhat involved, and
its meaning not entirely clear, but it contains nothing which

could have injured the defendant. It did not go to a recovery, but was apparently intended to instruct the jury that the negligence of the driver of the automobile could not be imputed to the plaintiff. That proposition was not denied by the defendant, and was undoubtedly sound upon the facts and we find no error in that ruling.

The appellant relies mainly upon the defense of contributory negligence as presented by its second prayer, which sought to remove the case from the consideration of the jury on the ground that on all the evidence in the case the plaintiff was guilty of contributory negligence as a matter of law. And its counsel have presented that defense to this Court with commendable frankness, and have carefully examined and analyzed its decisions applying that doctrine to somewhat analogous facts. But its contention ignores the difference in the location and situation of the several occupants of an automobile, and attempts to measure and characterize the conduct of each of them by one arbitrary and unchanging formula. But that cannot be done, for negligence, whether primary or contributory, is a relative and not an absolute thing, and does not exist apart from the circumstances upon which it is predicated. *Schell v. United Rwys. Co.,* 144 Md. 531. Acts or omissions which might amount to gross negligence on the part of the driver of an automobile, might not be negligent at all on the part of a passenger therein, because ordinary care would require the driver, operating such a potentially dangerous vehicle as an automobile on a public highway, to exercise a more constant and intense vigilance to detect danger and to avoid injury to himself or others than could reasonably be expected or required from a mere passenger. One riding whether as an invited guest in a private car, or as a passenger in a public conveyance such as a taxicab, cannot under all circumstances be expected to be constantly on the lookout for possible danger, and to distract and confuse the driver by a steady flow of warning admonitions, but he is entitled to rely to some extent at least upon the vigilance of the driver if he appears to have ordinary skill and experience.

If however the passenger knows, or should as a reasonably cautious and prudent person know, that danger may follow the operation of the car in a particular manner or in a particular course, it is his duty to take such measures as may be open to him to avoid it, and he is guilty of negligence if he fails to do so. And the place which a passenger occupies in an automobile is also important in determining whether he exercised reasonable care and prudence to detect and avoid danger, for one on the front seat with the driver may have a far better opportunity of discovering any danger ahead in the course of the car, than one in the back seat. And whether under the circumstances of a given case the failure of a passenger to discover danger and to do what he can to avoid it is negligence or not, is usually a question for the jury. These rather obvious conclusions are in no sense in conflict with the cases cited by the appellant, but on the contrary are supported by them. *Wash., B. & A. R. Co. v. State,* 136 Md. 111; *Lavine v. Abramson,* 142 Md. 222; *State v. Phillinger,* 142 Md. 374.

Applying these principles to the following facts conceded by the prayer, we cannot say that the plaintiff was guilty of contributory negligence as a matter of law. She was seated on the right hand side of the rear seat of an automobile, the windows of which were open at the time it approached the crossing. Directly in front of her, and to some extent interfering with her view of the road ahead, sat Mrs. Winters. The car was travelling at from twenty-five to thirty miles an hour. The buildings and "butter bean patch" on her right screened the approaching train from her view. The train itself gave no warning by bell or whistle or otherwise of its approach, and she did not hear it, and did not know that it was approaching until too late to avoid the collision. She had passed over the crossing the day before on her way from Baltimore to Pittsville, but she was not familiar with it, and at the time of the accident did not know that she was approaching it, and the tracks themselves, being below the level of the surface of the concrete roadway, were not visible to

her. She did not see the warning signs or any of them. In the back of the car with her was her husband and the two small children of Mr. and Mrs. Winters, and her husband had been leaning on her shoulder trying to sleep. She looked out from time to time, but more to observe the scenery than to look out for danger, nor did she know that any threatened. These facts certainly exhibit no such prominent and decisive act of commission or omission as would justify this court in characterizing her conduct as negligent in law. If we accept as we must under this prayer as true the testimony of her witness that the train gave no warning of its approach, then the only thing which she failed to do, which she might have done, was to observe the warning signs along the roadway. But that, under the facts stated, was not such an omission as would amount to negligence in law. Because from her place in the car, she could not without some special and unusual effort well see them until the car was abreast of them, and it was not necessarily negligent for her to fail to read the legends on the oil sign and the state road sign, when it is considered that she was passing them at possibly thirty miles an hour, and that the oil sign was similar in general appearance to signs found along nearly all roads, advertising oil, gasoline, and other commodities, and that the state highway sign was illegible. Nor can it be said that she was negligent in failing to see the cross arm sign, which was only 12½ feet from the tracks, because the position of Mrs. Winters may have prevented her from seeing that before she saw the approaching train. This prayer was therefore properly refused, and as there was in our opinion legally sufficient evidence of primary negligence on the part of the appellant, its first prayer was also properly rejected.

Nor do we find any error in the modification of the defendant's eighth prayer. As originally offered, it predicated negligence on the failure of the plaintiff to observe the state road sign, although there was evidence that it was so defaced as to be illegible, and it would therefore not necessarily have meant anything to her had she seen it. For that

reason the court would have been justified in rejecting the prayer altogether, for it could not have been assumed, in the face of testimony to the contrary, that she could have read the legend on it, but as its only modification was the elimination of the objectionable part of it, we cannot see how the appellant was injured by it.

For reasons already stated, the judgment in this case must be reversed and it is therefore unnecessary to deal at length with the tenth exception, which was taken to an order passed by the trial court in disposing of a motion for a new trial. But it may be said, in connection with the question presented by that exception, that for the reasons stated in *Brawner v. Hooper,* 151 Md. 579, so much of that order as required the appellant to waive its right of appeal as a condition precedent to the entry of a *remittitur* of $5,000, should the plaintiff elect to file the same. was invalid.

> *Judgment reversed and case remanded for a new trial, the appellee to pay the costs in this court.*