**MAYOR AND CITY COUNCIL OF BALTIMORE**

v.

**Michael Lee HART.**

No. 16 Sept. Term, 2006.

Court of Appeals of Maryland.

Nov. 6, 2006.

Darrell Chambers, Asst. Sol. (Ralph S. Tyler, City Sol. and William R. Phelan, Jr., Principal Counsel, on brief), Baltimore, MD, for petitioner,

Irwin E. Weiss (Morris E. Balser, on brief), Baltimore, MD, for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, and GREENE, JJ.

CATHELL, Judge.

This case arises from a motor vehicle accident in Baltimore City. On February 16, 2002, a Baltimore City police officer, responding to a call, drove a marked police car through a red traffic signal without stopping and collided with a vehicle driven by Michael Lee Hart. On August 20, 2003, Hart, the respondent, filed a complaint in the Circuit Court for Baltimore City against the Mayor and City Council of Baltimore ("the City"), petitioner, and also against his insurer, Allstate Insurance Company ("Allstate"), alleging injuries resulting from the February 16, 2002, collision. Respondent asserted a single claim of negligence against the City and a count against Allstate as his uninsured motorist carrier.

Maryland's General Assembly has statutorily dictated the minimum safe driving conduct for emergency vehicles on a statewide level. Maryland Code (1977, 2006 Repl. Vol.), § 21–106 of the Transportation Article [1] provides that, when responding to an emergency call, "the driver of an emergency vehicle may ... [p]ass a red or stop signal, a stop sign, or a yield sign, *but only after slowing down as necessary for safety* ...." § 21–106(b)(2) (emphasis added). The Baltimore City Police Department, however, provides a more stringent stan-

---

1. We shall refer to the current version of the Code in this instance, as the pertinent language is unchanged from the time of the accident.

dard in its Baltimore City Police Department General Order No. 11–90 (General Order 11–90). That rule provides that Baltimore City police, when responding to an emergency call for service, must first stop their vehicle when intending to cross an intersection against a red traffic signal and, when assigned as a primary or secondary unit for dispatched calls and responding in an emergency mode, must bring their vehicle to a *full* stop before crossing against *any* traffic control device. General Order 11–90(2)(b) and (4)(b).

Prior to trial, on January 14, 2005, petitioner filed a motion *in limine* to exclude evidence of General Order 11–90. On March 3, 2005, following a hearing, the court denied petitioner's motion. Trial was held on March 30 and 31, 2005. At trial, evidence of General Order 11–90 was introduced by respondent. Petitioner objected to the introduction of the evidence, but its objection was overruled. On March 31, 2005, the trial court issued jury instructions, including an instruction on General Order 11–90. After deliberating, the jury found for respondent and returned a verdict of $46,894.05. The damages were split between petitioner—$20,000.00 (the statutorily mandated maximum)—and Allstate—$26,894.05.[2]

Petitioner noted a timely appeal to the Court of Special Appeals. On February 2, 2006, the intermediate appellate court affirmed the decision of the Circuit Court. *Mayor and City Council of Baltimore v. Hart*, 167 Md.App. 106, 891 A.2d 1134 (2006). Petitioner then filed a petition for writ of certiorari; which we granted on June 7, 2006. *Baltimore v. Hart*, 393 Md. 242, 900 A.2d 749 (2006).

Petitioner presented two questions for our review:

"1. Are a police department's internal rules or guidelines admissible in a vehicular negligence case to demonstrate that the driver of a police emergency vehicle in emergency service violated the standards of behavior for emergency response, when there is a statute that establishes a different standard?

---

2. Allstate is no longer a party to this proceeding.

"2. Did the trial court err in denying the City's motion in limine, intended to exclude evidence of police departmental guidelines at trial; in allowing the introduction of such evidence at trial; and in including a jury instruction based on that evidence?"

We hold that a police department's internal rules and guidelines are admissible in specific situations in a vehicular negligence case when they are relevant to whether an officer's conduct in that particular situation was reasonable. In the case *sub judice*, General Order 11–90 stated specifically what the conduct of a Baltimore City police officer should be when responding in an emergency mode before crossing an intersection against a red traffic signal—the officer must come to a *full* stop. General Order 11–90 was specifically relevant to the officer's conduct in the case *sub judice* and is, therefore, admissible. Violation of the General Order is not negligence *per se*, but it is relevant as to whether the officer's conduct was reasonable. Because we find the evidence admissible, the motion *in limine* was properly denied and we need not address further the introduction of the evidence at trial or the jury instruction [3] pertaining to the General Order.

## I. Facts

We adopt the facts as stated by Judge Davis, writing for the Court of Special Appeals in its decision below:

"On February 16, 2002, [respondent] and Officer Mark V. Greff, a Baltimore City Police Officer, were involved in a motor vehicle collision at the intersection of Madison and Wolf[e] Streets in Baltimore City. The intersection of Madison and Wolf[e] Streets is controlled by a traffic signal. [Respondent] testified that, as he was headed westbound on

---

3. In regard to the jury instruction, the trial judge properly informed the jury of the relevance of General Order 11–90. The judge first stated that the General Order is not a statute. He then instructed that the jury "may use that order in determining whether or not the officer acted reasonably under those situations, but it in and of itself is not evidence of negligence." This instruction is in conformance with our opinion regarding the admissibility of General Order 11–90, and thus need not be separately addressed.

Madison Street, he stopped for a traffic light at Madison Street and Washington [Street]; thereafter, [respondent] proceeded on Madison Street to the intersection of Madison and Wolf[e]. [Respondent] stated that, as he approached the light at the intersection of Madison and Wolf[e] Streets, it turned green for westbound vehicles. He proceeded through the intersection and, at that time, his van was struck by the police cruiser, driven by Officer Greff. [Respondent's] testimony was that he never heard a police siren. He also did not see any police lights prior to entering the intersection.

"Three witnesses, other than [respondent] and Officer Greff, testified at the hearing. Gregory Ware was in a vehicle on Wolf[e] Street, approximately a city block away from the accident, traveling in the same direction as the officer when he witnessed the accident. Ware testified that Officer Greff had the police lights on as he approached the intersection, but he only heard the siren intermittently, describing the sound as 'the little boop, boop, boop.' Ware's signed statement from the morning of the accident indicates that Officer Greff's lights and siren were activated. Ware testified that his statement indicating that Officer Greff's siren was activated was incorrect. Ware then refused to authenticate the statement. He also stated that Officer Greff's brake lights were activated, but he did not see the Officer come to a complete stop at the intersection. Ware recalled that the traffic signal controlling the direction of the Officer was red.

"At the time of the accident, Jerry Perkins was operating a vehicle directly behind [respondent's] vehicle on Madison Street. He confirmed that, as he and [respondent] approached the intersection, the traffic signal turned green. Perkins was driving with his windows slightly open. His testimony, consistent with that of other witnesses, was that the Officer's cruiser entered the intersection and struck [plaintiff's] van. Perkins did not recall seeing the police vehicle emergency lights flashing or hearing the siren prior to the accident; he testified, however, that he noticed the

police lights were on after the accident and he could hear a faint siren. He was not able to state, with certainty, whether the lights were turned on prior to or following the accident.

"Officer Charles Reickel, one of the officers assigned to investigate the accident, also testified at trial, principally to introduce the statement of Gregory Ware into evidence. Officer Reickel authenticated Ware's statement, testifying that he wrote the facts contained in the statement, but Ware then read and signed the statement. He further explained that, if Ware had indicated Officer Greff 'chirped' his siren, it would have been entered that way on the report. The report as written, according to Officer Reickel, reflects that the siren was on continuously.

"At the time of the accident, Officer Greff was responding to a police emergency, involving another officer struggling with a suspect on Monument Street. Officer Greff testified that he responded to the emergency with the lights and siren on. As he approached the intersection of Madison and Wolf[e] Streets, he slowed his vehicle to clear the intersection, then proceeded through the intersection once it was cleared of vehicles. He stated that he proceeded through the intersection under the impression, however mistakenly, that all vehicles including [respondent's] van had yielded to his vehicle. Officer Greff did not recall the color of the traffic signal as he approached the intersection, but testified that he was trained to slow down his vehicle at both green and red lights and clear the intersection because pedestrians do not always follow the traffic signals. When asked during direct examination if he was aware of General Order 11–90, Officer Greff stated that he was not aware of that specific General Order, but was aware that there are General Orders issued by the Commissioner. On cross—examination, Officer Greff was handed a copy of General Order 11–90, and was still not able to say whether he had ever seen it.

. . .

"On March 2, 2005, [prior to trial,] the court held a hearing on [respondent's] motion *in limine* to preclude

evidence of General Order 11–90. [Petitioner], relying on *Richardson v. McGriff,* 361 Md. 437[, 762 A.2d 48] (2000), argued that Baltimore Police Department General Order 11–90 is irrelevant, and use of the General Order would allow [respondent] to mislead the jury in its determination of whether the officer violated the relevant duty of care. Additionally, [petitioner] argue[d] that Md. Code (2002 Repl. Vol., 2005 Supp.), § 21–106(b)(2) entitled the officer to '[p]ass a red or stop signal, a stop sign, or a yield sign, but only after slowing down as necessary for safety,' and the Baltimore City Police Commissioner cannot usurp that privilege.

"In his response to [petitioner's] motion, [respondent] argue[d] that *McGriff, supra,* is distinguishable; insofar as *McGriff* was a police brutality case, where the Court of Appeals precluded the use of the guidelines because they were not relevant, subject to interpretation, and required the officer to exercise his/her discretion. In the case *sub judice,* [respondent] contends General Order 11–90 is specific, the rules articulated therein do not require the exercise of discretion, and the rules are relevant to the facts of the case. [Respondent] also argued that the police Commissioner may adopt an enhanced duty of care, officers must follow those orders, and they are subject to sanctions for not following orders.

"The court denied the motion *in limine,* stating, 'there's nothing in the rules of the game that says when a statute is more general that a local jurisdiction can't make stricter rules. They can't make more liberal rules, but they can make stricter rules, and that's what they've done here and so the motion *in limine* is denied.' "

*Hart,* 167 Md.App. at 110–14, 891 A.2d at 1136–38. A jury trial was held on March 30 and 31, 2005. On March 31, 2005, the jury found in favor of respondent and the court entered judgment against petitioner. Petitioner appealed to the Court of Special Appeals, which, as we have said, affirmed the Circuit Court's decision in an opinion filed on February 2, 2006.

## II. Discussion

The central issue in this case is whether a Baltimore City Police Department General Order, specifically General Order 11–90, which governs "Departmental Emergency Vehicle Operation," is relevant, and thus, admissible when the conduct the case is concerned about involves the operation of an emergency vehicle by a Baltimore City police officer in Baltimore City. Under the circumstances here present, we hold that the General Order is admissible for the reasons set forth *infra.*

*General Order 11–90*

General Order 11–90 was published on November 7, 1990. It is titled "Departmental Emergency Vehicle Operation" and states in pertinent part:

"**POLICY**

Members of this Department shall operate departmental vehicles with utmost care and caution, comply with all traffic laws and **SHALL NOT BECOME ENGAGED IN HIGH—SPEED PURSUIT DRIVING**, except under EXIGENT circumstances. Exigent circumstances consist of:

Instances where the officer determines that immediate action is necessary; and

Insufficient time exists to resort to other alternatives; and

Failure to pursue may result in grave injury or death.

The Department recognizes it is better to allow a criminal to temporarily escape apprehension than to jeopardize the safety of citizens and its officers in a high speed pursuit.

**General**

The City of Baltimore is a highly congested urban area which necessitates driving motor vehicles in a safe manner. In order for a departmental vehicle to be considered operating in an **EMERGENCY MODE, BOTH ROOF MOUNTED EMERGENCY LIGHTS AND ELECTRIC SIREN MUST BE ACTIVATED** . . . .

## RESPONSIBILITIES

. . .

2. When responding to an emergency call for service (e.g., Calls for service, either reported or on view describing incidents involving personal injury or the potential for personal injury, reported to be in progress or having just occurred), and upon activating your EMERGENCY LIGHTS AND ELECTRONIC SIREN you may:

. . .

b. Pass a red stop signal, a stop sign, or yield sign, but only after stopping to ensure safe passage of other vehicles and pedestrians.

. . .

4. When assigned as Primary and Secondary Units for dispatched calls and responding in an emergency mode:

a. **SLOW DOWN AT ALL INTERSECTIONS,** ensure the intersection is safe to enter and then proceed cautiously.

b. When crossing against any traffic control device, **BRING YOUR VEHICLE TO A FULL STOP** and ensure the intersection is safe to enter before proceeding.

c. Ensure that your **VEHICLE SPEED IS BOTH SAFE AND REASONABLE** under the prevailing roadway and environmental conditions.

**NOTE**: As an operator of an emergency vehicle you are charged with the duty to drive with due regard for the safety of all persons. (See Transportation Article, Section 21–106d).

. . .

## COMMUNICATION OF DIRECTIVE

Commanding officers and supervisors shall communicate the contents of this directive to their subordinates and ensure compliance. This directive is effective on the date of publication."

General Order 11–90. The bolding and underlining is present in the original text of the General Order, providing extra emphasis.

Baltimore City Police Department General Orders are created and issued by the Baltimore City Police Commissioner pursuant to authority granted by the Code of Public Local Laws of Baltimore City. Specifically, Code of Public Local Laws of Baltimore City, § 16–7 vests the Baltimore City Police Commissioner with authority. *Hart*, 167 Md.App. at 114, 891 A.2d at 1138; *see also Beca v. City of Baltimore*, 279 Md. 177, 180–81, 367 A.2d 478, 480 (1977); *Biscoe v. Baltimore City Police Dep't*, 96 Md.App. 1, 7, 623 A.2d 666, 670 (1993). Code of Public Local Laws of Baltimore City, § 16–7 states in pertinent part:

> "In directing and supervising the operations and affairs of the Department, the Commissioner shall . . ., be vested with all the powers, rights and privileges attending the responsibility of management, and may exercise the same, where appropriate, by rule, regulation, order or other departmental directive which shall be binding on all members of the Department when duly promulgated.
>
> . . .
>
> The authority herein vested in the Police Commissioner shall specifically include, but not be limited to, the following:
>
> . . .
>
> (8) To regulate attendance, conduct[ ] training, discipline and procedure for all members of the Department and to make all other rules, regulations and orders as may be necessary for the good government of the Department and its members.
>
> . . .
>
> (14) To suspend, amend, rescind, abrogate or cancel any rule, regulation, order or other department directive adopted by him or by any former Police Commissioner and to adopt all other reasonable rules, regulations and orders as he may deem necessary to enable the Depart-

ment effectively to discharge the duties imposed upon it by this subtitle."

It is evident that the Baltimore City Police Commissioner enacted General Order 11–90 pursuant to his express authority to adopt General Orders. The General Order at issue here became effective on November 7, 1990, and applies to all members of the Baltimore City Police Department (i.e., the police officer in the case *sub judice*) when on duty.

### *Relevancy*

Petitioner argues that General Order 11–90 is not relevant and any evidence of the order should have been excluded from the trial. Petitioner bases this argument upon the existence of a Maryland statute which governs some of the same conduct—Maryland Code (1977, 2006 Repl. Vol.), § 21–106 of the Transportation Article. Section 21–106 of the Transportation Article states, in pertinent part:

"(a) *Circumstances for which privileges granted.*—Subject to the conditions stated in this section, the driver of an emergency vehicle registered in any state may exercise the privileges set forth in this section while:

(1) Responding to an emergency call;

(2) Pursuing a violator or suspected violator of the law; or

(3) Responding to, but not while returning from, a fire alarm.

(b) *Enumeration of privileges.*—Under the circumstances stated in subsection (a) of this section, the driver of an emergency vehicle may:

. . .

(2) Pass a red or stop signal, a stop sign, or a yield sign, but only after slowing down as necessary for safety; . . .

. . .

(d) *Driver not relieved from duty of care.*—This section does not relieve the driver of an emergency vehicle from the duty to drive with due regard for the safety of all persons."

Both § 21–106 of the Transportation Article and General Order 11–90 govern the operation of Baltimore City police emergency vehicles when responding to an emergency call within the City of Baltimore. It is evident that § 21–106 is less stringent in its requirements than General Order 11–90. Section 21–106 provides that, when responding to an emergency call, the driver may pass a red or stop signal, but only after slowing down. § 21–106(b)(2) of the Transportation Article. General Order 11–90 provides that when responding to an emergency call for service the driver may pass through an intersection against a red stop signal, but only after stopping and, additionally, that when assigned as primary or secondary unit for dispatched calls and responding in an emergency mode, when crossing against any traffic control device, the driver must bring the vehicle to a *full* stop before crossing. General Order 11–90(2)(b) and (4)(b). Petitioner contends that § 21–106 of the Transportation Article preempts General Order 11–90 and thus, evidence of the General Order should not have been permitted at trial. Under the circumstances of the case *sub judice,* we disagree.

■ The fact that the General Assembly has enacted § 21–106 of the Transportation Article, governing the operation of emergency vehicles throughout the State, does not prohibit the Baltimore City Police Department Commissioner, as duly authorized by the Code of Public Local Laws of Baltimore City, from promulgating regulations and guidelines which enact additional requirements for the operation of emergency vehicles by Baltimore City police officers within Baltimore City, so long as the additional provisions do not allow conduct the State statute prohibits. General Order 11–90 is not preempted by § 21–106 of the Transportation Article. When both a State law and a local regulation govern the same subject matter, Maryland, generally, follows the "concurrent power" rule. *Mayor and City Council of Baltimore v. Sitnick,* 254 Md. 303, 255 A.2d 376 (1969); *see also* J. Scott Smith, *State and Local Legislative Powers: An Analysis of the Conflict and Preemption Doctrines in Maryland,* 8 U. Balt. L. Rev. 300 (1979); M. Peter Moser, *County Home*

*Rule—Sharing the State's Legislative Power with Maryland Counties,* 28 Md. L.Rev. 327 (Fall 1968).

In *Sitnick,* the Court addressed whether a minimum wage law enacted by the City Council of Baltimore, which established a higher minimum wage than the State law, would be allowed to co-exist with the State law. The Court found that:

> "In the instant case we are of the opinion that the City law neither conflicts nor is inharmonious with the provisions of the State law, nor conflicts with any intention of the Legislature to reserve to itself the exclusive right to legislate on the entire subject matter, as we shall discuss in this opinion; therefore, the only theory by which the City law would be a nullity or invalid, is on the premise that the presence of the State in this field of regulation amounts to a pre-emption of the field by occupation, with the resulting ouster of local power to legislate."

*Id.* at 311, 255 A.2d at 379. In analyzing this issue, the Court looked to *Rossberg v. State,* 111 Md. 394, 74 A. 581 (1909), "[t]he landmark case in this area, concerning the construction to be followed when there is an overlapping of state and local enactments dealing with the same subject matter." *Sitnick,* 254 Md. at 312, 255 A.2d at 380. In *Rossberg,* the Court dealt with a Baltimore City ordinance which provided more severe penalties for the sale and use of cocaine than the State law. The Court found that the ordinance and State law did not conflict and that municipal authorities have concurrent power. *Id.* at 410–17, 74 A. at 582–84. The *Sitnick* Court concluded that:

> "A distillation of the opinions we have cited [4] leaves the residual thought that a political subdivision may not prohibit what the State by general public law has permitted, but it may prohibit what the State has not expressly permitted.

---

4. *American Nat'l Bldg. & Loan Ass'n v. Mayor and City Council of Baltimore,* 245 Md. 23, 224 A.2d 883 (1966); *Mayor and City Council of Baltimore v. Stuyvesant Ins. Co.,* 226 Md. 379, 174 A.2d 153 (1961); *Herman v. Mayor and City Council of Baltimore,* 189 Md. 191, 55 A.2d 491 (1947); *Eastern Tar Products Corp. v. State Tax Comm'n,* 176 Md. 290, 4 A.2d 462 (1939); *Billig v. State,* 157 Md. 185, 145 A. 492 (1929).

Stated another way, unless a general public law contains an express denial of the right to act by local authority, the State's prohibition of certain activity in a field does not impliedly guarantee that all other activity shall be free from local regulation and in such a situation the same field may thus be opened to supplemental local regulation."

254 Md. at 317, 255 A.2d at 382.

Addressing the application of *Rossberg* to these issues, Mr. Smith stated in his Comment that:

"While subsequent cases decided under the *Rossberg* conflict rule may appear to be incongruous, there is harmony in the court's decisions. An analysis of the conflict rule reveals that there may be two tests, which employ different analytical techniques, to determine whether a conflict exists between a public general law and a local law. These tests may be labeled as the verbal test and the functional test.

"An analysis using the verbal test focuses on the terms and coverage of the disputed laws; under the functional test the analysis focuses on the functional impact of the local law upon the public general law's operation and purposes. Under the verbal test, if the language or provisions of the local law prohibit conduct permitted by the public general law, or if the local law permits conduct prohibited by the language or provisions of the public general law, then a verbal conflict exists and the local law is invalid. For example, in *Heubeck v. City of Baltimore* [, 205 Md. 203, 107 A.2d 99 (1954)], a municipal ordinance prohibited landlords under certain circumstances from evicting tenants upon the expiration of their leases. A public general law, however, provided for the eviction of tenants holding over at the expiration of their terms. Since the local law prohibited conduct, the eviction of holdover tenants, which the public general law permitted, it was in verbal conflict and consequently invalid.

"Unlike the analytical techniques employed under the verbal test, determination of conflict under the functional test requires an analysis of the public general law's function or purpose. If the local law is in furtherance of the public

general law's function, then the local law is valid without regard to any verbal conflict. The first case illustrating a functional application of the *Rossberg* conflict rule was *State v. Brown* [, 142 Md. 27, 119 A. 684 (1922)]. In *Brown*, a public general law required all motor vehicles to yield the right of way to other vehicles approaching from the right. A local ordinance, however, exempted vehicles such as ambulances from this requirement. Application of the verbal test would have invalidated the ordinance since it permitted an act, the failure to yield the right of way, which the public general law prohibited. The functional test, on the other hand, explains the court's decision to uphold the local law. Presumably, the purpose or function of the public general law was to promote traffic safety. The local law did not counter this function; in fact, it furthered the function of the public general law by exempting only emergency vehicles, which necessarily require the right of way.

"Perhaps the clearest illustration of the functional test taking priority over the verbal test under the conflict rule is *City of Baltimore v. Sitnick*."

J. Scott Smith, *State and Local Legislative Powers: An Analysis of the Conflict and Preemption Doctrines in Maryland*, 8 U. Balt. L. Rev. at 308–09 (footnotes omitted).

In the case *sub judice*, we find ourselves presented with a situation similar to that of *Brown* and *Sitnick*. The function of § 21–106 of the Transportation Article is, presumably, to help facilitate the safe operation of emergency vehicles. General Order 11–90 simply provides for, arguably, a higher safety standard. The reasoning for this is evident from General Order 11–90 itself, which states: "The City of Baltimore is a highly congested urban area which necessitates driving motor vehicles in a safe manner." General Order 11–90 neither conflicts nor is inharmonious with § 21–106 of the Transportation Article. Additionally, there is no express provision in the Maryland Code showing that the General Assembly wants to restrict all such regulation of the operation of emergency vehicles to itself. Therefore, the City Council of

Baltimore, through its delegation of power to the Baltimore City Police Commissioner, may supplement such regulations.

Petitioner argues that General Orders enacted by the Baltimore City Police Commissioner are distinguishable from actual ordinances enacted by Baltimore City as a municipal corporation. It is petitioner's contention that General Orders are not created pursuant to a legislative power, as were the ordinances at issue in *Rossberg, Brown,* and *Sitnick.* In particular, petitioner points to the fact that the Code of Public Local Laws of Baltimore City, § 16–7 provides that the Commissioner may "suspend, amend, rescind, abrogate or cancel any rule, regulation, order or other department directive adopted by him or by any former Police Commissioner." Petitioner argues that this susceptibility to change without notice renders General Orders inapplicable to analysis under the concurrent power theory explicated in *Rossberg* and *Sitnick.* We disagree. While a Baltimore City Police Department General Order is not a "law" *per se,* it is a provision duly promulgated by the Baltimore City Police Commissioner, pursuant to powers authorized by Code of Public Local Laws of Baltimore City, § 16–7. The Code of Public Local Laws of Baltimore City specifically provides for the use by the Commissioner of General Orders.

With this issue addressed, we turn to the relevance of General Order 11–90 in respect to the reasonableness of Officer Greff's conduct in the case *sub judice.* This case arises out of a simple negligence claim. Chief Judge Bell, writing for the Court in *Brown v. Dermer,* 357 Md. 344, 744 A.2d 47 (2000), discussed the standards by which we analyze negligence claims:

"Negligence is 'any conduct, except conduct recklessly disregardful of an interest of others, which falls below the standard established by law for protection of others against unreasonable risk of harm.' *Holler v. Lowery,* 175 Md. 149, 157, 200 A. 353, 357 (1938), quoting *Restatement of Torts* A.L.I. § 282. *See* William L. Prosser, *Handbook of The Law of Torts* § 43, at 250 (4th ed. 1971). It does not exist apart from the facts and circumstances upon which it is

predicated, *Baltimore, C. & A.R. Co. v. Turner,* 152 Md. 216, 228, 136 A. 609, 614 (1927); *Dickey v. Hochschild, Kohn & Co.,* 157 Md. 448, 450, 146 A. 282, 283, (1929); *Schell v. United Rys. & Elec. Co.,* 144 Md. 527, 531, 125 A. 158, 159 (1924), necessarily involves the breach of some duty owed by a defendant to the plaintiff, *Philadelphia, W. & B.R. Co. v. Kerr,* 25 Md. 521, 530 (1866), and is inconsistent with the exercise of ordinary care. *Paramount Development Corp. v. Hunter,* 249 Md. 188, 193, 238 A.2d 869, 871 (1968); *Brown v. Ellis,* 236 Md. 487, 497, 204 A.2d 526, 530–31 (1964). In order to establish a cause of action for negligence, the plaintiffs must prove the following elements: (1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty. *Richwind [Joint Venture 4 v. Brunson],* 335 Md. [661,] 670, 645 A.2d [1147,] 1151 [(1994)] (citations omitted). *See [Hartford Ins. Co. v. ]Manor Inn,* 335 Md. [135,] 147–48, 642 A.2d [219,] 225; *Southland Corp. v. Griffith,* 332 Md. 704, 712–13, 633 A.2d 84, 88 (1993).

. . .

"A duty may be, and often, is prescribed by statute. *See e.g., Schweitzer v. Brewer,* 280 Md. 430, 440–41, 374 A.2d 347, 353 (1977). Where that is the case, the courts will defer to the legislative determination:

'The general rule regarding the standard of conduct applied under our decisions to measure . . . negligence does not supersede a prescription of conduct by the legislature. As we have indicated, what governs is the legislature's intention . . . not necessarily what a "reasonably prudent" person would do under such circumstances. We said in *Md. Medical Service v. Carver,* 238 Md. 466, 478, 209 A.2d 582, 588 (1965):

"If the legislative intent is expressed in clear and unambiguous language, this will be carried into effect by this Court even if this Court might be of the opinion that the policy of the legislation is unwise, or even

harsh or unjust, if no constitutional guarantees are impaired by the legislation." '

*Id.* at 439–40, 374 A.2d at 353.

"It is well-settled that the violation of a statute may furnish evidence of negligence. *Richwind,* 335 Md. at 670–71, 645 A.2d at 1151–52; *Manor Inn,* 335 Md. at 155, 642 A.2d at 229; *Atlantic Mutual v. Kenney,* 323 Md. 116, 124, 591 A.2d 507, 510 (1991); *Aravanis v. Eisenberg,* 237 Md. 242, 259–60, 206 A.2d 148, 158 (1965). But the mere violation of a statute will not sustain an action for damages unless the violation is the proximate cause of the injury. Proximate cause is established by determining whether the plaintiff is within the class of persons sought to be protected, and the harm suffered is of a kind which the drafters intended the statute to prevent. *Manor Inn,* 335 Md. at 156, 642 A.2d at 229; *Peterson v. Underwood,* 258 Md. 9, 15, 264 A.2d 851, 854 (1970); *Owens v. Simon,* 245 Md. 404, 409, 226 A.2d 548, 551 (1967). It is the existence of this cause and effect relationship that makes the violation of a statute *prima facie* evidence of negligence. *Liberto v. Holfeldt,* 221 Md. 62, 65, 155 A.2d 698, 700 (1959)."

*Brown,* 357 Md. at 356–59, 744 A.2d at 54–55. Additionally, this Court stated well over a century ago, in *Phila., Wil. & Balto. R.R. Co. v. Kerr,* 25 Md. 521 (1866), which concerned a negligence action arising out of the collision of a steam ferry-boat with a canal boat, that: "[I]t may be said, in general, that any failure by one engaged in the pursuit of his own occupation or business, to observe precautionary rules or regulations established by competent authority, to guard against accidents and prevent injuries to others, is in legal contemplation, a want of ordinary care." 25 Md. at 531; *Johnson v. County Arena, Inc.,* 29 Md.App. 674, 679, 349 A.2d 643, 645–46 (1976). While this statement by the Court is, arguably, dictum, it reflects upon how our Court has viewed the analysis of negligence claims throughout the centuries.

Section 21–106(d) of the Transportation Article provides that the driver of an emergency vehicle has "the duty to drive with due regard for the safety of all persons." General Order

11–90 specifically refers Baltimore City police officers to that duty in the note to subsection (4), stating:

> "**NOTE**: As an operator of an emergency vehicle you are charged with the duty to drive with due regard for the safety of all persons (See Transportation Article, Section 21–106d)."

General Order 11–90(4). Petitioner acknowledges that "duty and due or reasonable care not to harm others lie at the heart of a negligence claim." Petitioner states in its brief that, "[t]here was no dispute that Officer Greff owed a duty of reasonable care to the drivers of other vehicles as he responded to the emergency call involving an officer struggling with a suspect." Petitioner agrees that the jury must "determine what constituted reasonable care under the circumstances and whether Officer Greff's actions conformed to that standard." Petitioner even quotes the definition of negligence from the Maryland Civil Pattern Jury Instructions: "Negligence is doing something that a person using reasonable care would not do, or not doing something that a person using reasonable care would do. *Reasonable care means that caution, attention or skill a reasonable person would use under similar circumstances.*" MPJI Cv 19:1 (emphasis added); *see Landon v. Zorn,* 389 Md. 206, 226, 884 A.2d 142, 153 (2005).[5]

Petitioner, however, contends that § 21–106 dictates a statutory standard of reasonable care, which is different from that espoused in the Maryland Civil Pattern Jury Instructions. Section 11–205 of the Transportation Article specifically provides that, in a cause of action for negligence, unless provided otherwise, "[t]he provisions of the Maryland Vehicle Law do not in any way add to or detract from the right of any person who is injured or whose property is damaged by the negligent operation of a motor vehicle to sue and recover damages as in the case of the negligent use or operation of any other vehicle . . . ." § 11–205(a)(1). In fact, operators of emergency vehicles are liable for ordinary negli-

---

**5.** The transcript indicates that the trial judge did, in fact, utilize this instruction.

gence, i.e., a failure to exercise reasonable care and diligence *under the circumstances. Altenburg v. Sears,* 249 Md. 298, 239 A.2d 569 (1968); *Martin v. Rossignol,* 226 Md. 363, 174 A.2d 149 (1961), *overruled on other grounds, Buck v. Cam's Broadloom Rugs, Inc.,* 328 Md. 51, 612 A.2d 1294 (1992); *City of Baltimore v. Fire Ins. Salvage Corps,* 219 Md. 75, 148 A.2d 444 (1959); *Baltimore Transit Co. v. Young,* 189 Md. 428, 56 A.2d 140 (1947). Operators of emergency vehicles, however, are not held to the same standard of ordinary care as regular motorists. *Fire Ins. Salvage Corps,* 219 Md. at 82, 148 A.2d at 448; *Young,* 189 Md. at 432–33, 56 A.2d at 142.

In this case, Officer Greff's conduct must be held to the standard of what a reasonable Baltimore City police officer's (as opposed to what an ordinary driver's) conduct would have been under similar circumstances. In determining whether the conduct of a Baltimore City police officer was reasonable in a particular situation, the Baltimore City Police Department's regulations and guidelines, as well as State statutes, are relevant to the issue of reasonableness.[6]

Petitioner attempts to distinguish § 21–106 of the Transportation Article from General Order 11–90 by describing the statute as a "law" and the General Order as an internal standard.[7] It is the petitioner's contention that the *legal* standard of care can only be determined by looking to the statute, and that the General Order is therefore not relevant. Petitioner's reasoning is misplaced and, in any case, Maryland law does not support that position.[8]

---

**6.** We can conceive of no other purpose of General Order 11–90 than to prescribe what the Baltimore City Police Commissioner had determined to be reasonable conduct in circumstances of factual situations similar to that in this case. If the petitioner wanted some other standard, or did not want this standard, it should not have created it.

**7.** As discussed *supra,* while a Baltimore City Police Department General Order is not a "law" *per se,* it is a provision duly promulgated by the Baltimore City Police Commissioner, pursuant to powers authorized by Code of Public Local Laws of Baltimore City, § 16–7.

**8.** Petitioner cites *several New York cases in support of its argument:* Rivera v. New York City Transit Auth., 77 N.Y.2d 322, 329, 567 N.Y.S.2d

Petitioner asserted in its motion *in limine* and in its argument before the Court of Special Appeals, that *Richardson v. McGriff*, 361 Md. 437, 762 A.2d 48 (2000) established a prohibition against the introduction or use of police department regulations or guidelines. *Richardson* was a police brutality case in which the central issue was the use of deadly force. The victim there attempted to introduce Baltimore City police "guidelines" as evidence and the respondent police officers filed a motion *in limine* to exclude the evidence. The Court discussed this particular evidence, stating:

> "The documentary evidence sought to be excluded consisted of nine pages of single-spaced guidelines issued by the Baltimore City Police Department on the use of deadly force and 13 pages of single-spaced rules and regulations concerning a wide range of police conduct and behavior. Most of the rules and regulations, which cover the entire gamut of police conduct, from being courteous and fulfilling financial obligations, to saluting superior officers, to refraining from publicly criticizing public officials, to the circumstances when gambling, drinking, and smoking is not permitted, have no discernable relevance to any issue in the case."

*Id.* at 446, 762 A.2d at 53. Judge Davis, for the Court of Special Appeals, cogently discussed and distinguished *Richardson* from the case *sub judice:* (1) The court found that the cases were factually distinguishable (constitutional analysis due to allegation of excessive force by a police officer in *Richardson* versus a simple negligence claim in the case *sub judice*), (2) The guidelines that the victim attempted to intro-

629, 569 N.E.2d 432 (1991); *Lubecki v. City of New York,* 304 A.D.2d 224, 234, 758 N.Y.S.2d 610 (N.Y.App.Div.2003); *Conrad v. County of Westchester,* 259 A.D.2d 724, 725, 687 N.Y.S.2d 404 (N.Y.App.Div. 1999); *Lesser v. Manhattan & Bronx Surface Transit Operating Auth.,* 157 A.D.2d 352, 356, 556 N.Y.S.2d 274 (N.Y.App.Div.1990); *Newsome v. Cservak,* 130 A.D.2d 637, 638, 515 N.Y.S.2d 564 (N.Y.App.Div.1987). These cases, however, are inapposite to Maryland case law. *See Sitnick supra,* 254 Md. at 320, 255 A.2d at 384 (discussing, in situations such as that here, that New York follows the "pre-emption" concept, whereas Maryland generally follows the "concurrent power" theory).

duce in *Richardson* were broad and, for the most part, not relevant to the issues, as opposed to General Order 11–90 being specifically relevant to the issue of the officer's conduct in the case *sub judice*, (3) The guidelines in *Richardson* were discretionary, stating that " '[t]he attacked officer is the person who has to evaluate the potential seriousness of the attack and determine an appropriate level of response,' " *id.* at 447, 762 A.2d at 53, whereas General Order 11–90, as to the present issue, is not discretionary, stating "[w]hen crossing against any traffic control device, **BRING YOUR VEHICLE TO A FULL STOP** . . . ." *See Hart*, 167 Md.App. at 119–20, 891 A.2d at 1141–42. Finally, Judge Davis correctly analyzed *Richardson* as not establishing a *per se* rule excluding police department guidelines from consideration in all circumstances. *Hart*, 167 Md.App. at 120, 891 A.2d at 1142. The guidelines were not admissible in *Richardson* because they were not relevant, whereas General Order 11–90 *is* relevant in the case *sub judice*.

Police department regulations and guidelines have been considered by this Court in several instances. *Richardson*, 361 Md. at 504, 762 A.2d at 84 (Harrell, J., dissenting) ("This Court has frequently considered police procedures and guidelines in determining whether police activity was reasonable under given circumstances."); *Williams v. Mayor & City Council of Baltimore*, 359 Md. 101, 139–40, 753 A.2d 41, 61–62 (2000) (considered Baltimore City Police Department General Order 10–93 in a negligence action in order to determine whether officer was "divested of discretion"); *State v. Pagotto*, 361 Md. 528, 557, 762 A.2d 97, 113 (2000) (Bell, C.J., dissenting) ("[W]hile a violation of police guidelines is not negligence *per se*, it is a factor to be considered in determining the reasonableness of police conduct."); *State v. Albrecht*, 336 Md. 475, 501–03, 649 A.2d 336, 348–50 (1994) (evidence of Montgomery County Police Department's policies and directives from Field Operations Manual admissible in negligence action); *Boyer v. State*, 323 Md. 558, 591, 594 A.2d 121, 137 (1991) (discussing breach of duty by a police officer in a negligence action, the Court stated, "[v]ery often when a

breach of the police officer's duty is found in high speed chase cases like the present, there are particular aggravating circumstances, such as a violation of police department policies or guidelines. . . ."); *Beca*, 279 Md. at 182–84, 367 A.2d at 481–82 (admitted evidence of a General Order to show an employment contract).[9]

General Order 11–90 is relevant because it is directly applicable to the specific conduct of the Baltimore City police officer in this case.[10] Officer Greff was operating a marked police vehicle in an emergency mode while responding to a call. The evidence clearly indicates that he crossed against a red traffic signal at the intersection of Madison and Wolfe Streets without bringing his vehicle to a complete stop and, as a result, his vehicle collided with respondent's van, which was crossing the same intersection on a green traffic signal. Officer Greff, therefore, did not comply with General Order 11–90.[11] Under these circumstances, that failure, and the General Order itself, were relevant to the issue of reasonableness and thus, are admissible.

Judge Davis, for the Court of Special Appeals, concluded: "We hold that the trial court did not err in admitting General Order 11–90. There is no general prohibition

---

**9.** Additionally, respondent cited to several out-of-state cases where police guidelines were admitted, albeit no objections were made: *Dillenbeck v. Los Angeles*, 69 Cal.2d 472, 72 Cal.Rptr. 321, 446 P.2d 129 (1968); *Denver v. DeLong*, 190 Colo. 219, 545 P.2d 154 (1976); *Biscoe v. Arlington County*, 738 F.2d 1352 (D.C.Cir.1984); *Brown v. Pinellas Park*, 557 So.2d 161 (Fla.Dist.Ct.App.1990); *Mason v. Bitton*, 85 Wash.2d 321, 534 P.2d 1360 (1975).

**10.** A General Order which is not relevant to a police officer's conduct in a negligence action is not admissible (as was the case in *Richardson*). Evidence must be relevant to be admissible. Md. Rule 5–402 (". . . all relevant evidence is admissible. Evidence that is not relevant is not admissible.").

**11.** Officer Greff testified that he did not have any knowledge of General Order 11–90. Whether or not he had knowledge of the General Order is not dispositive. Code of Public Local Laws of Baltimore City, § 16–7 provides that rules promulgated by the Baltimore City Police Commissioner "shall be binding on all members of the Department."

against the introduction or use of police department regulations or guidelines, notwithstanding the Court of Appeals' decision in *[Richardson]*, as we have explained, *supra*. The guidelines, offered by [respondent] in this case, are particularly relevant to the reasonableness of Officer Greff's conduct in proceeding through the intersection against the traffic control signal. The statute makes it clear that the Commissioner is vested with the authority to promulgate rules and regulations incident to the management of the department. Pursuant to that authority, General Order 11–90 was issued, and the General Order, without question is binding on all members of the Department. The General Order, requiring officers to bring their vehicles to a complete stop before crossing against a traffic control signal, involves no use of discretion. We agree with Chief Judge Bell's statement in *[State v.] Pagotto*[, 361 Md. 528, 762 A.2d 97 (2000)] that 'a violation of a police guideline is not negligence *per se*, it is, [however], a factor to be considered in determining the reasonableness of police conduct.' 361 Md. at 557[, 762 A.2d at 113] (Bell, C.J., dissenting)."

*Hart*, 167 Md.App. at 122–23, 891 A.2d at 1143. We agree with Judge Davis's reasoning for the Court of Special Appeals, and affirm its decision.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONERS.**